[890 NYS2d 493]

Neal Flomenbaum, Appellant, v New York University, Respondent.

First Department, December 3, 2009

APPEARANCES OF COUNSEL

*Foley & Lardner LLP*, New York City (*Barry G. Felder* of counsel), for appellant.

*Nancy Kilson*, New York City, for respondent.

## OPINION OF THE COURT

DeGrasse, J.

On this appeal we must decide whether a university's offer of tuition-free enrollment in a two-year program rather than the four-year program applied for can be construed as a breach of an agreement with the offeree's parent. We answer the question in the negative based on the facts and legal principles that follow. The 2002 agreement resolved a tenure dispute between defendant and plaintiff, a former faculty member at the NYU School of Medicine. The agreement provides that plaintiff's children

"shall be entitled to tuition remission upon admission to New York University for undergraduate or graduate study. Their admission to New York University and their entitlement and advantages to tuition remission shall be on the same basis with the same courtesies as a then current, active, full-time employed, tenured member of the faculty of the School of Medicine or a retired, tenured member of the faculty of the School of Medicine, whichever is greater."

The agreement, which contains a merger clause, makes no other provision with respect to tuition remission. Plaintiff's son, Adam, applied for admission to the NYU College of Arts and Sciences (CAS) for the September 2006 term. By letter dated March 2, 2006, the university informed Adam that it was unable to offer him admission to CAS. Instead, Adam was offered admission to NYU's General Studies Program (GSP), a two-year course of study in the liberal arts. As explained in the letter and an accompanying brochure,

- all GSP courses fulfill liberal arts requirements toward the bachelor's degree at NYU's eight undergraduate schools and colleges;

- after two years, GSP students are eligible to transfer as juniors to one of NYU's four-year programs, having earned 64 credits, half of the 128 credits needed for the NYU bachelor's degree;

- GSP students can participate in all NYU student activities; and

- only 10% of the students who were not offered admission to NYU's four-year bachelor's degree program were selected for GSP.

In keeping with the agreement, enrollment in GSP would have qualified Adam for tuition remission.

This action is based upon the premise that the offer of admission to GSP instead of CAS violated the obligation to extend Adam the courtesies due a faculty child pursuant to the agreement. An understanding of what these courtesies entail is crucial to our analysis. Defendant's unrefuted answer to an interrogatory describes the courtesies afforded the children of active, full-time, tenured faculty members of the School of Medicine as follows:

"Generally, the Admissions Committee becomes

aware that an applicant is the child of a faculty member because the applicant discloses the information about his parents' employment on the application form. The Admissions Committee makes a list of applicants who have designated the University as the employer of a parent. As to the individuals on that list, the Admissions Committee takes a second look at their admissions decisions to make sure that those decisions are fair. If any such student is not qualified for admission to the particular school to which he or she applied, the Admissions Committee may, because of his or her status as the child of a faculty member, give more consideration to admitting the student to the General Studies Program than would otherwise be the case."

Plaintiff testified that he has no direct knowledge of any other relevant courtesies or considerations. Plaintiff also acknowledged that the agreement and the courtesies it incorporates did not guarantee a seat for Adam in the freshman class of CAS. In sum, plaintiff bargained for a fair decision on his son's application for admission to CAS, and added consideration as a candidate for GSP in the event that he was not qualified for admission to CAS. The next question is whether there is an issue of fact as to whether NYU's decision to deny Adam admission to CAS was a fair one. Here we examine the process by which Adam's application was evaluated.

Barbara F. Hall, NYU's Associate Provost for Enrollment Management, described the university's admissions process at her deposition. Ms. Hall testified that when an application is received, a file is assembled for review by the admissions team, and data taken from the application is entered in the university's Student Information System (SIS). The file would include the application, transcripts and recommendations. The applicant's relationship, if any, with an NYU employee would be entered in SIS. The file is reviewed by two members of the team responsible for admissions to the particular school or college to which the applicant has applied. The team members then confer and make their individual recommendations regarding the action to be taken on the application. The file would be read by one of two directors in the event of a disagreement between the team members. Although the file is reviewed holistically, the applicant's grade point average is very carefully scrutinized because it is considered the best indicator of success at NYU. An applicant's relationship with an NYU employee would be taken

into account after the file has been read but before an official decision is made.* In this regard, an evaluation is made as to whether the recommended action on the application appears to be equitable. Relationship to a faculty or staff member is considered a positive if an applicant is considered "on the bubble," i.e., distinguished by some but not all of the characteristics deemed necessary for admission.

Approximately three years after the agreement was executed, Adam applied for admission to CAS for the term beginning in September 2006. Adam declined to check a box on the application form that would have indicated his parent or legal guardian was an NYU employee. Accordingly, on its face, Adam's application gave no indication of his status under the tuition remission agreement. Approximately one month before the application was submitted, plaintiff forwarded Adam's resume to Dr. Richard Levin, the Vice Dean of NYU's School of Medicine, who had negotiated the tuition remission agreement on behalf of the university. The information regarding the tuition remission agreement was passed on to Dr. Robert Berne, NYU's Vice President for Health. Dr. Berne was supposed to but neglected to initially apprise the Admissions Committee of Adam's entitlement to faculty child status. Unaware of the tuition remission agreement, the Admissions Committee nonetheless decided to admit Adam to GSP. After the Admissions Committee passed upon Adam's application, Dr. Berne asked Ms. Hall to review his file. Ms. Hall testified that she believed Dr. Berne's request was related to what she described as a previous lawsuit. Upon conducting her review, Ms. Hall concluded that the Admissions Committee's determination was a very good decision. At her deposition, Ms. Hall gave the reasons for her conclusion.

Ms. Hall testified that GSP is a great program for students who can benefit from its smaller classes and more intrusive advising. Ms. Hall added that Adam was not a suitable candidate for CAS because "his transcript was not particularly stellar" and his "S[cholastic] A[ptitude] T[est score]s . . . would have been in the lower part" of the class for which he applied. She felt that Adam had done well in his particular high school, where there is a lot of individual attention, which is also something that GSP provides. Ms. Hall further testified that Adam was not "on the bubble" as defined above and his low grade point

---

* Notwithstanding the agreement, relationships with all NYU employees are given the same consideration regardless of any particular employee's position with the university.

average led her and the Admissions Committee to believe that he would benefit from GSP's seminar style teaching as opposed to the teaching method of CAS, which is a "research university" and does not provide the intrusive support offered by GSP.

Adam registered as a freshman in GSP but later withdrew his registration, citing the university's denial of his request for permission to take certain elective courses he wanted during his freshman year, in addition to its unwillingness to admit him to CAS. Adam applied for and was denied admission to the freshman classes at Brown, Columbia and Georgetown Universities, as well as Dartmouth College. He transferred to Columbia University after completing his freshman year at the University of Miami. Plaintiff's claim for damages includes the tuition paid to both universities.

Under the first cause of action of the amended complaint, plaintiff alleges that in breach of the tuition remission agreement the Admissions Committee did not extend the agreed-to considerations and courtesies in acting upon Adam's application for admission to CAS. Plaintiff's second cause of action is based on a contract theory with respect to prospective applications for admission to NYU to be filed by his two younger children. Supreme Court granted defendant's motion for summary judgment and denied plaintiff's cross motion for an order determining liability in his favor based on defendant's alleged spoliation of evidence. We now affirm.

As noted above, NYU's Admissions Committee should have been, but was not made aware of Adam's rights under the tuition remission agreement when it processed his application. Seizing upon that misstep, plaintiff argues that defendant's liability has been established by its negative answer to the following interrogatory: ".Did the Admissions Committee take into account the Courtesies and Considerations Provision [of the tuition remission agreement] in evaluating Adam Flomenbaum's application for admission to the freshman class entering CAS in the Fall 2006 semester?" That interrogatory, however, misses the point. The relevant question is whether Adam was accorded the same courtesies the son or daughter of a university employee would have received. As set forth above, such courtesies consist of a second look at the Admissions Committee's decision to make sure it is fair, and additional consideration for admission to GSP if an applicant is not qualified for admission to the school or college to which he or she has applied. Plaintiff cites no proof in the record that the courtesies required by the tu-

ition remission agreement encompass anything else. A party opposing summary judgment must submit proof in evidentiary form or explain the failure to do so (*Barbour v Knecht*, 296 AD2d 218, 227 [2002]). Plaintiff has thus failed to meet his burden in light of NYU's prima facie showing of entitlement to summary judgment. Because no additional courtesies have been identified, we disagree with the dissent's view that NYU's offer of admission to GSP "provides significant support for plaintiff's allegation that Adam would have been admitted to CAS if Adam had received the 'courtesies' to which plaintiff was entitled." Ms. Hall's testimony about her handling of Adam's application and the reasons for her determination constitute proof that the Admissions Committee's decision was given the required second look and Adam was properly and fairly considered for GSP. Because this proof is not refuted we find it dispositive of the issue. Hence, despite the initial lack of communication between Dr. Berne and the Admissions Committee, Adam's application was handled with all of the courtesies required under the parties' tuition remission agreement.

For two reasons we disagree with the dissent's premise that a "jury could find that the reason the committee took a second look at Adam's application was not because of the bargained for courtesies, but rather because of its initial breach of the contract." First, the salient point is that the contractually required second look was taken, albeit after Dr. Berne initially failed to communicate with the Admissions Committee. The reason for the second look would, therefore, be irrelevant. Second, the inquiry suggested by the dissent involves the issue of academic decision-making. Courts exercise restraint in applying traditional legal rules to determinations concerning academic qualifications because such determinations generally rest upon the subjective professional judgment of trained educators (*Matter of Olsson v Board of Higher Educ. of City of N.Y.*, 49 NY2d 408, 413 [1980]). When asked to review the substance of a genuinely academic decision, such as the one at issue here, courts should show great respect for the faculty's professional judgment. "Plainly, they may not override it unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment" (*Regents of Univ. of Mich. v Ewing*, 474 US 214, 225 [1985]). The record before us demonstrates that in taking a second look at the Admis-

sions Committee's determination, Ms. Hall did exercise professional judgment in weighing Adam's grade point average, his SAT scores, and his academic needs in relation to the learning environment offered by GSP. A trial in this case would require a court or a jury to engage in its own academic decision-making on the question of Adam's suitability for admission to CAS.

The dissent cites *Eidlisz v New York Univ.* (61 AD3d 473 [2009]) and *Brody v Finch Univ. of Health Sciences/The Chicago Med. School* (298 Ill App 3d 146, 698 NE2d 257 [1998], *lv denied* 179 Ill 2d 578, 705 NE2d 434 [1998]) for the proposition that an institution "cannot hide behind the screen of academic freedom" to avoid a contractual obligation. Both cases are distinguishable because they did not involve genuinely academic decisions. *Eidlisz* was a suit upon a promise that a student would be billed per credit and obtain a degree by simply completing three courses. *Brody* involved a promise of admission to the defendant's medical school to anyone who completed the defendant's applied physiology program and received a specified minimum grade point average. Those cases are inapposite for the additional reason that here defendant is not seeking to be excused from contractual obligation; it has fulfilled its obligation. In *Raethz v Aurora Univ.* (346 Ill App 3d 728, 732, 805 NE2d 696, 699 [2004]), the court held that "in the student-university context, a student may have a remedy for breach of contract when it is alleged that an adverse academic decision has been made concerning the student but *only* if that decision was made *arbitrarily, capriciously, or in bad faith*" (emphasis added). Guided by our own jurisprudence, we hold that such a contractual remedy is available only where "the challenged determination was arbitrary and capricious, irrational, made in bad faith or contrary to Constitution or statute" (*cf. Matter of Susan M. v New York Law School*, 76 NY2d 241, 246 [1990]). Accordingly, the first cause of action, sounding in breach of contract, was properly dismissed.

 The second cause of action, pleaded with respect to plaintiff's twin sixth graders who have obviously not applied for admission to NYU, was also properly dismissed. A claim is premature and may not be maintained if the issue presented for adjudication involves a future event beyond the control of the parties, and which may never occur (*American Ins. Assn. v Chu*, 64 NY2d 379, 385 [1985], *appeal dismissed and cert denied* 474 US 803 [1985]). Plaintiff's cross motion for an order of preclu-

sion based upon defendant's alleged spoliation of evidence was properly denied. The information in question concerned statistical data regarding faculty children who applied for admission to, but did not enroll in, CAS for the fall 2006 semester. As noted above, Adam's application was given the required second look as well as consideration for admission to GSP. Therefore, we disagree with the dissent's contention that a comparison of Adam's application with those of the other faculty children who unsuccessfully applied for admission to CAS would shed light on whether plaintiff was afforded the required courtesies. Moreover, such a comparison would be an exercise in academic decision-making. The sanction sought by plaintiff is unwarranted since the required element of an unfairly gained advantage by reason of nondisclosure has not been demonstrated (see e.g. Holliday v Jones, 297 AD2d 471 [2002]). Also, the allegedly spoliated statistics are irrelevant to the propriety of NYU's academic decision under the standards discussed above.

We have considered plaintiff's remaining arguments and find them unavailing.

For the foregoing reasons, the order of Supreme Court, New York County (Milton A. Tingling, J.), entered June 23, 2008, which granted defendant's motion for summary judgment dismissing the complaint and denied plaintiff's cross motion for an order of preclusion based on spoliation of evidence, should be affirmed, with costs.

ACOSTA, J. (dissenting). At issue in this case is whether "academic freedom" to choose an incoming class insulates defendant from liability for allegedly breaching the terms of a settlement agreement with a former faculty member. The agreement obligated NYU to extend certain courtesies and considerations to the former faculty member that it normally extends to full-time tenured medical school faculty when their children apply for admissions. Defendant may not breach its obligations under the agreement on the ground of academic freedom. Moreover, given the nature of the litigation, defendant should not have destroyed the paper applications of similarly situated applicants. Accordingly, plaintiff's breach of contract claim with respect to plaintiff's eldest son should not have been summarily dismissed, and plaintiff's cross motion for spoliation sanctions should have been granted to the extent of directing that an adverse inference charge be issued.

Background

Plaintiff was the Associate Director of Emergency Services at NYU, Assistant Professor of Clinical Medicine in the NYU School of Medicine, and an attending physician at the Bellevue and NYU Hospital Centers from 1979 to 1987 when he left over a tenure dispute. As a result of NYU's conduct toward plaintiff, the American Association of University Professors (AAUP) placed NYU on its list of censured administrations in 1990. In 2002, Dr. Richard Levin, the newly appointed Vice Dean of the School of Medicine, sought to resolve the tenure dispute with plaintiff. The parties eventually resolved their dispute by entering into an agreement in November 2002. Paragraph 2 of the agreement required plaintiff to send a letter to the AAUP in a form annexed to the agreement, and to take "all reasonable and appropriate actions as may be requested to assist in the removal of the censure of New York University."

For its part, NYU, in addition to considerations of a confidential nature, agreed in paragraph 6 to extend certain courtesies and considerations in the admission process to plaintiff's children:

> "[Plaintiff's children] shall be entitled to tuition remission upon admission to New York University for undergraduate or graduate study. Their admission to New York University and their entitlement and advantages to tuition remission shall be on the same basis with the same *courtesies as a then current, active, full-time employed, tenured member of the faculty of the School of Medicine* or a retired, tenured member of the faculty of the School of Medicine, whichever is greater" (emphasis added).

In the fall of 2005, plaintiff's eldest son, Adam, was preparing to apply for admission to NYU's College of Arts and Sciences (CAS) for the September 2006 term. As plaintiff was no longer employed by NYU, Adam did not check off the "faculty child" space on the application. Instead, to exercise his rights under the agreement, plaintiff provided Adam's resume to Dr. Levin.[1] Dr. Levin wrote to plaintiff that Adam had a "lovely resume" and that he would be entering Adam's admission process at a "very high level." At his deposition, Dr. Levin testified that he

---

1. The majority casts these facts negatively by stating that "Adam declined to check a box on the application form that would have indicated his parent . . . was an NYU employee." It is not that Adam declined to check the box, but rather by not checking it, he honestly indicated that no family member was currently employed by NYU. Plaintiff, however, informed Dr. Berne about Adam's application, to avail himself of the bargained-for consideration.

informed Dr. Berne, the Vice President for Health and "key liaison" between the medical school and the rest of the university, of Adam's application, and reminded Dr. Berne of the obligations NYU undertook under the agreement.

Dr. Berne, however, conceded that he neglected to inform the Admissions Committee of NYU's obligations under the agreement, and had no explanation for his failure to do so. In fact, in response to an interrogatory asking "Did the Admissions Committee take into account the Courtesies and Considerations Provision [paragraph 6 of the agreement] in evaluating [Adam's] application for admission to the freshman class entering CAS in the Fall 2006 semester?" a representative of NYU responded "No." Adam was subsequently denied admission to CAS and instead was informed that he met the requirement for admission to the General Studies Program (GSP), a two-year program at NYU to which he never applied. Rather than enrolling in GSP, Adam attended the University of Miami College of Arts and Sciences in the 2006-2007 school year, and then transferred to Columbia University in the fall of 2007. Plaintiff paid tuition for Adam at both institutions.

Plaintiff filed the initial complaint in July 2006, alleging that when he first spoke with Dr. Berne, he requested that "a mutually acceptable impartial, respected outside educator review all of the relevant applications of all faculty children who applied to NYU," and that Dr. Berne rejected this request, stating that "if [plaintiff] was not satisfied with his decision, he could sue NYU." In April 2007, in response to plaintiff's interrogatories, NYU provided plaintiff with the mean and median SAT scores and high school GPAs "for the children of active, full-time employed [or] retired tenured members of the faculty of the School of Medicine applying for admission to CAS for the freshman class entering in the Fall, 2006 term." One month later, in a supplemental document, it stated that its initial response was incorrect and that it "does not collect data enabling it to provide information regarding students who applied for admission to CAS, unless they subsequently enrolled."

The paper files for students who were not admitted in spring 2006 and those who were admitted but did not enroll were shredded in the normal course of business in October 2006. According to Barbara Hall, NYU's Associate Provost for Enrollment Management, there had been no "hold" put on any files other than Adam's. She noted that the paper files included staff comments and recommendations. Although digital records were

maintained on the Student Information System, they did not include these handwritten comments and recommendations.

Plaintiff cross-moved for an order, based on NYU's spoliation of relevant records, precluding defendant from contesting that its breach of the agreement caused Adam to be rejected from CAS. Supreme Court denied the motion, finding that "significant, unshaken deposition testimony" indicated NYU's document shredding was routine and pursuant to policy. It also held that plaintiff failed to show the destruction was done "willfully, contumaciously or in bad faith," causing the "loss of allegedly vital documents . . . prejudicial to his case."

Analysis

Viewing the evidence in the light most favorable to plaintiff, the party opposing summary judgment, and drawing all reasonable inferences in his favor (*see Boyd v Rome Realty Leasing Ltd. Partnership*, 21 AD3d 920 [2005]), defendant has failed to establish its prima facie entitlement to summary judgment with respect to plaintiff's breach of contract claim as it relates to his son Adam. The elements of a breach of contract claim are formation of a contract between the parties, performance by the plaintiff, the defendant's failure to perform, and resulting damage (*Clearmont Prop., LLC v Eisner*, 58 AD3d 1052, 1055 [2009]).

Here, a valid agreement was formed in 2002 whereby plaintiff agreed to settle a pending dispute with NYU that had caused the university to be censured by AAUP. Plaintiff performed under the agreement by writing the requisite letter to AAUP. Dr. Berne conceded that he failed to inform the Admissions Committee, as NYU was required to do under the agreement, to extend the courtesies it normally extends to the children of full-time, tenured medical school faculty members prior to a decision being made. Plaintiff's son was denied admission to CAS, and plaintiff was forced to pay tuition at another university.

In referring to an interrogatory response that the majority characterizes as "unrefuted," defendant described the "courtesies afforded the children of active, full-time, tenured faculty members of the School of Medicine." These "courtesies" include adding the applicant to the list of applicants whose parents are employed by NYU so that the Admissions Committee will "take[ ] a second look" at the decisions made in connection with those applicants "to make sure that those decisions are fair." Moreover, according to Ms. Hall, the relationship between an applicant and an NYU employee is *"taken into account after*

*the file has been read and prior to an official decision being made"* (emphasis added). It is unrefuted that this did not happen in Adam's case. The Admissions Committee rejected Adam's application to CAS and never provided him with the courtesy of a "second look" prior to making that decision. Defendant thus did not establish its prima facie entitlement to summary judgment.

The fact that NYU took a "second look" after the decision was made to reject Adam is of no moment in the context of this summary judgment motion. It bears mentioning that after Adam was rejected, Dr. Berne asked Hall to "look into it," and then read the file. Although she thereafter told him it was "a clear case" for Adam not being admitted to CAS, Dr. Berne acknowledged in his deposition that he did not know why Hall had so concluded. Indeed, Hall testified that because the university reviews applications holistically, and that "Admissions is more of an art than it is a science, any applicant could gain entry." There are thresholds, however, that are generally required to be competitive, including a GPA of B or better, 1250 or higher on the SATs and, generally a 3 to a 6 activity rating. Based on these thresholds, Adam appeared to be "competitive" for admission to CAS rather than a "clear case" for rejection, since he had a 3.2 GPA, a combined SAT score of 1340, an activity rating of 4, and excellent recommendations.

Importantly, there is no question that Adam would have been entitled to some benefit had the Admissions Committee known of the agreement and its courtesies and consideration provision. In this respect, I disagree with the majority that plaintiff merely bargained for a "fair decision on his son's application" and "added consideration as a candidate for GSP in the event that he was not qualified for admission to CAS." Any applicant who applies to NYU should be entitled to a "fair" decision. And, by NYU's own literature, GSP is available to any applicant who meets the program's qualifications regardless of whether the applicant had a similarly worded agreement. Here, plaintiff specifically bargained for considerations extended to "full-time employed, tenured member[s] of the faculty of the School of Medicine."

In any event, in the context of a summary judgment motion, where the evidence is viewed in the light most favorable to the opposing party, the plain language of the agreement, as well as the other evidence presented in the summary judgment motion, indicates that the bargained-for courtesies included much more

than taking a "second look" after a decision had already been made. Indeed, Hall stated that "[i]f it appears that a student is on the bubble, then having a faculty or staff relationship would be positive," and, as noted above, that "positive" would be taken into account prior to an official decision. Therefore, contrary to the majority, plaintiff has identified a courtesy other than merely having the committee take a "second look." In other words, the "second look" was designed to ensure that medical school faculty status was factored into the equation prior to a decision being made, and not simply to make sure that the decision was fair or that additional consideration for GSP was given.

Indeed, Dr. Berne testified that the NYU relationship gets "some very minor weight . . . but if you had two children, two applicants with roughly the same impression of the whole application, and the only difference was one was a faculty child and one was not, that would be a weighing on the faculty child if everything else on the application was the same." Dr. Berne and Hall thus agree, as does defendant in its interrogatory answers, that Adam should have received special consideration, but did not, prior to the decision on his application.

Notwithstanding this evidence, the majority accepts and regards as dispositive Hall's testimony that in taking a second look, the Admissions Committee exercised professional judgment in deciding to reject Adam for admission to CAS. But issues of fact are for a jury to decide. A jury could find that the reason the committee took a second look at Adam's application was not because of the bargained-for courtesies, but rather because of its initial breach of the contract. In other words, since "taking a second look" is not mentioned in the agreement, defendant's claim that the bargained-for courtesies merely included taking a second look to make sure the decision was fair was simply an attempt to excuse its failure to perform under the agreement in the first place. The reason for the second look in this case is thus relevant, and a jury should decide whether to reject it or not.

Moreover, the letter from NYU informing Adam that it was unable to offer him admission to CAS provides significant support for plaintiff's allegation that Adam would have been admitted to CAS if Adam had received the "courtesies" to which plaintiff was entitled. That letter informed Adam that his application had been "selected" for the GSP, congratulated him on that selection and stated that he met "the requirements for

admission to the program." In accompanying materials, NYU stated that "[t]he opportunity to attend NYU through GSP is offered only to a carefully selected group of students. This past year, only 10 percent of the students who were not offered admission to a four-year bachelor's program [at NYU] were selected for GSP." Drawing all reasonable inferences in favor of plaintiff, surely a jury could conclude that Adam was at least "on the bubble" and would have been admitted to CAS if NYU had provided the bargained-for courtesies.

Defendant's attempt to dismiss the case by asserting its right to academic freedom in selecting an incoming class does not excuse the university from honoring its contractual obligations. If NYU had applied the agreed-upon courtesies and considerations prior to rejecting Adam from CAS, its actions might have been virtually immune from judicial scrutiny. However, where, as here, an institution has contractually obligated itself, it cannot hide behind the screen of academic freedom to avoid its obligations (*see e.g. Eidlisz v New York Univ.*, 61 AD3d 473 [2009]; *Brody v Finch Univ. of Health Sciences/The Chicago Med. School*, 298 Ill App 3d 146, 698 NE2d 257 [1998], *lv denied* 179 Ill 2d 578, 705 NE2d 434 [1998]). In *Brody*, the defendant breached its contractual obligation by denying medical school admission to certain applicants who were members of a specific pre-med program by failing to apply the criteria to which the defendant had contractually agreed, and damages were awarded to the applicants.[2] The majority attempts to distinguish these cases on the basis that they do not involve "genuinely academic deci-

---

**2.** The cases cited by the IAS court on this issue do not apply here because none of the cited cases involved a contractual obligation. In *Brown v Einstein Coll. of Medicine of Yeshiva Univ.* (172 AD2d 197 [1991]), there was no contract at issue; the plaintiff merely claimed age discrimination based on the school's failure to admit him in the normal application process. Moreover, unlike Adam, plaintiff Brown's test scores and grades were well below average for admission to the medical school. Similarly, *Ochei v Helene Fuld Coll. of Nursing of N. Gen. Hosp.* (22 AD3d 222 [2005], *lv denied* 6 NY3d 714 [2006]), which concerned a challenge to the school's decision to dismiss a student after she twice failed a course, did not involve any contractual obligation. In the one case cited by defendant below that did involve a contractual obligation, *Mangla v Brown Univ.* (135 F3d 80, 83 [1st Cir 1998]), the court noted that the proper standard for interpreting the contract is "reasonable expectation— what meaning the party making the manifestation, the university, should reasonably expect the other party to give it" (quoting *Giles v Howard Univ.*, 428 F Supp 603, 605 [D DC 1977]). Here, given the nature of the dispute and the parties' willingness to settle the dispute by, inter alia, including paragraph 6 in their agreement, it is certainly reasonable for NYU to have anticipated that

sions," and that NYU is not seeking to be excused from its contractual obligations since it has in fact fulfilled its obligations. With respect to the former, regardless of the academic decisions involved, this is a breach of contract case. Defendant could have resolved the dispute with plaintiff in a number of different ways, including paying plaintiff a certain sum that he requested. It chose, however, to bind itself to the terms of the agreement. Second, whether defendant fulfilled its obligation under the terms of the agreement is a matter for the trier of facts to decide, not this Court.

The majority also cites *Raethz v Aurora Univ.* (346 Ill App 3d 728, 732, 805 NE2d 696, 699 [2004]) in support of its concession that a student may have a remedy for breach of contract from an adverse academic decision (there, dismissal from a masters program for failing to complete field instruction), but only if that decision was made arbitrarily, capriciously or in bad faith. That case is inapposite. Adam was never a student of NYU, and plaintiff's claim with respect to Adam has nothing to do with whether NYU properly dismissed Adam from CAS for poor academic performance. The issue here is whether defendant breached its agreement with plaintiff, and as noted above, plaintiff presented sufficient proof in admissible form regarding the elements of a breach of contract claim to avoid summary judgment.

With respect to damages, there is no question that plaintiff incurred tuition expenses at other universities because Adam was not admitted to CAS. Therefore, in the event a jury were to find in favor of plaintiff, there are indisputable damages that must be established at trial (*J.R. Loftus, Inc. v White*, 85 NY2d 874, 877 [1995]).

Defendant's claim that Adam could have mitigated these damages by attending the School of General Studies or by reapplying for admission to CAS has no merit. "The rule requiring the party injured by a breach of contract to make efforts to minimize the damages . . . does not require that the party enter into a new contract with the party in default" (36 NY Jur 2d, Damages § 25; *see Rollins v Bowman Cycle Co.*, 96 App Div 365, 369 [1904]). "It is often reasonable to refuse to mitigate by agreeing to a substitute contract with the breaching party" (11 Corbin on Contracts § 57.11, at 314 [rev ed]).

plaintiff would expect NYU to honor the courtesies and considerations it agreed to extend.

In my opinion, the court also erroneously denied plaintiff's cross motion for a finding of spoliation. As noted above, plaintiff had a conversation with Dr. Berne during which he asked that a disinterested party review the relevant applications of all faculty children who applied to NYU. Dr. Berne rejected this request and stated that plaintiff could sue if he was not satisfied with NYU's response. This conversation clearly placed defendant on notice of the relevance of paper files of all faculty children who applied for admission to CAS.[3] Rather than placing a hold on these documents, NYU merely held Adam's paper file, and in the normal course of business destroyed the other files in October 2006, approximately four months *after* the filing of the complaint. Once a party is "on notice that the evidence might be needed for future litigation," it may not destroy documents, even "pursuant to normal business practice" (*Lawrence Ins. Group v KPMG Peat Marwick*, 5 AD3d 918, 920 [2004]; *see also Conderman v Rochester Gas & Elec. Corp.*, 262 AD2d 1068 [1999] [spoliation sanctions appropriate for discarding items in good faith and pursuant to normal business practices, where litigation is pending or there is notice of a specific claim]).

The fact that NYU kept a digital version of the files is of no moment. The paper files were important because they contained the admissions staff's handwritten comments on the applications they reviewed. A direct comparison of these files with Adam's could have established whether Adam had been extended the courtesies plaintiff had bargained for, and whether he would have been admitted to CAS. Although defendant improperly destroyed these documents, the record, as the IAS court found, does not indicate that the destruction was done "willfully, contumaciously or in bad faith." The destruction of these vital documents nonetheless prejudices plaintiff's case. Accordingly, the IAS court should have granted the cross motion to the extent of directing that an adverse inference charge be given to the jury.

I agree with the majority, however, that the IAS court properly dismissed the breach of contract claim on behalf of plaintiff's twin sixth graders as unripe and speculative.

---

**3.** Indeed, in response to interrogatory 15, defendant provided statistical data for applicants whose parents were either current or retired faculty members of the School of Medicine. Although it later informed plaintiff that its answer to interrogatory 15 was incorrect because it only reflected applicants who were admitted, it bears mentioning that defendant, in initially responding, never argued that the request was irrelevant.

RICHTER and ABDUS-SALAAM, JJ., concur with DEGRASSE, J.; McGUIRE, J.P., and ACOSTA, J., dissent in a separate opinion by ACOSTA, J.

Order, Supreme Court, New York County, entered June 23, 2008, affirmed, with costs.