JASON BRODY *et al.*, Plaintiffs-Appellants, v. FINCH UNIVERSITY OF HEALTH SCIENCES/THE CHICAGO MEDICAL SCHOOL, Defendant-Appellee (Kevin Lowe, Plaintiff).—JASON BRODY *et al.*, Plaintiffs-Appellees, v. FINCH UNIVERSITY OF HEALTH SCIENCES/THE CHICAGO MEDICAL SCHOOL, Defendant-Appellant (Kevin Lowe, Plaintiff).

Second District   Nos. 2—97—0967, 2—97—1024 cons.

Opinion filed July 31, 1998.

Lisa M. Gotkin and Clinton A. Krislov, both of Krislov & Associates, Ltd., of Chicago, for Jason Brody *et al.*

Lisa M. Noller, Timothy J. Patenode, and Harvey M. Silets, all of Katten, Muchin & Zavis, of Chicago, and Michael R. Booden, General Counsel, of North Chicago, for Finch University of Health Sciences/Chicago Medical School.

JUSTICE HUTCHINSON delivered the opinion of the court:

In July 1997 plaintiffs, Jason Brody, Yuan Chen, Vikas Gupta, Nilesh Hingarh, Kevin Lowe, Seth Maxwell, Yasmin Nibbe, Kiarash Sadrieh, Hooman Shabatian, and Josh Sussman, filed a complaint and petition for injunctive relief, seeking a temporary restraining order and an injunction against defendant, Finch University of Health Sciences/ The Chicago Medical School. This litigation arises from plaintiffs' reliance on defendant's alleged representations and promises that those students who enrolled in defendant's Applied Physiology Program and received a grade point average (GPA) of 3.0 or higher would be admitted to defendant's medical school. Plaintiffs alleged that defendant's failure to abide by its alleged representations and promises constituted a breach of contract, common-law fraud, and a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (the Consumer Fraud Act) (815 ILCS 505/1 *et seq.* (West 1996)). After a bench trial, the trial court determined that no violation of common-law fraud or consumer fraud existed but found an implied contract existed between plaintiffs and defendant and that defendants breached the contract with plaintiffs. Following the denial of plaintiffs' posttrial motion, plaintiffs appeal the judgment entered in defendant's favor on the common-law and consumer fraud counts, and defendant appeals from the judgment entered in plaintiffs' favor on the contract claim. Plaintiff Lowe is not a party to the appeal. We have consolidated these two cases and hereby affirm the judgment of the trial court.

The record reveals the following facts. Plaintiffs were students enrolled in defendant's Master of Science and Applied Physiology Program (the Program) for the 1996-97 year. Tuition for the Program

for 1996-97 was approximately $28,480. Defendant had a policy of giving serious consideration to those applied physiology students with a 3.0 GPA or better for admission to its medical school. Eighty students in the 1996-97 Program achieved a 3.0 GPA or better. Plaintiffs successfully completed their requirements under the Program and graduated with GPAs ranging from 3.2 to 3.6. On July 22, 1996, Timothy R. Hansen, Ph.D., associate dean for educational affairs and director of the Program, issued a memorandum to plaintiffs which stated that the medical school "[did] not expect to accept more than 50 students from the 1996-97 Applied Physiology class into the entering class in 1997." The "School of Graduate and PostDoctoral Studies Catalog" for 1995-96 states that defendant reserves the right to modify programs. However, it also states "modification of program requirements will not adversely affect those students already in a program." On or around June 26, 1997, Michael Booden, general counsel for defendant, informed the students' counsel that the medical school was accepting only the top 50 students from the Program. Booden stated that the class size of the medical school would consist of approximately 150 students. As of June 26, 1997, 50 applicants from the Program were offered admission to defendant's medical school.

On July 14, 1997, the bench trial commenced. Each of the plaintiffs testified at trial. These witnesses recounted their communications with defendant, their employment prior to enrolling in defendant's program, and their circumstances before and after enrolling in the Program. The trial testimony reflected that all of the plaintiffs communicated numerous times with people working in defendant's admissions department. The admissions department routinely informed plaintiffs that, if they achieved a 3.0 or better GPA, they would have a 90% to 95% chance of obtaining admission to defendant's medical school. Some of the plaintiffs visited the campus and spoke with Dr. Hanson and Dr. Booden, dean of defendant's medical school, who also indicated to those plaintiffs that, historically, a GPA of 3.0 was enough to get accepted into its medical school. Some plaintiffs telephoned former graduates of the Program who were subsequently admitted to defendant's medical school. This listing of former graduates was provided to prospective students, who were encouraged to contact these individuals with their questions about the Program.

Between May and June 1996 six of the plaintiffs received letters from defendant offering them admission into the Program; thereafter, those plaintiffs forwarded their seat deposits. The other three plaintiffs each received telephone calls from the admissions department on July 12, 16, and 17, 1996. To confirm their acceptance, they were advised not to send a deposit but rather to simply show up on July 22 and "everything else would be taken care of."

All but one plaintiff were employed prior to enrolling in the Program; their salaries ranged from approximately $20,000 to $150,000. All but one plaintiff relocated to the Chicago area; one plaintiff returned to Illinois from the Caribbean where he was attending another medical school. At least five plaintiffs gave up opportunities at other educational institutions to enroll in the Program. During the relocation process, plaintiffs signed leases to rent apartments.

Plaintiffs called Dr. Hansen as an adverse witness. Hansen testified that the medical school did not have a past policy of limiting acceptance to only 50 students from the Program into the medical school. Defendant decided to make this an "official" policy approximately two weeks before the first day of orientation. Hansen agreed that plaintiffs and the other students in the Program were not informed of this policy change until they received the memorandum on July 22. Hansen stated that the medical school would not consider more than 50 students from the Program, "no matter what." Hansen admitted, though, that all plaintiffs in the instant cause were academically qualified.

Theodore Booden, dean of defendant's medical school, also testified as an adverse witness. He agreed that the decision to limit acceptance to 50 Program students was made just a few weeks prior to the first day of orientation. Booden stated that creating a memorandum was the "fair thing to do." His premise was that the students had to know before they registered or paid tuition.

Booden was recalled to testify on behalf of defendant. Booden discussed the historical perspective of the Program. The Program was "built on a premise of compassion and understanding that we thought there were those out there highly qualified who were being rejected" from medical school. Booden opined that defendant should give those students "an opportunity to prove that they were capable of handling the curriculum" in the hopes they would be accepted into medical school, either defendant's or another. Booden testified that in recent years defendant had received an abundance of qualified applicants applying to the medical school from outside the Program. Booden felt that the medical school "should raise the bar" and take only the very best, leading to the conclusion and the ultimate decision to limit acceptance of Program graduates to 50 students.

Dr. Hansen next testified on behalf of defendant. He stated that, in answering prospective applicants' questions regarding the Program and subsequent admissibility to defendant's medical school, his "set practice" would be to inform students that the medical school would consider the Program graduates in the same light as all other applicants. For example, the medical school would consider their aca-

demic record and their noncognitive abilities in terms of behavior, motivation, demonstrated interest in medicine, interview scores, and faculty feedback on behavior. On cross-examination, Hansen admitted that he could not recall telling any specific prospective applicant about his "set practice."

Dana Frederick testified regarding her procedure when telephone or other inquiries were made relative to acceptance into the Program and medical school. She would tell prospective applicants that they would receive a master's degree in applied physiology if they completed the Program with a 3.0 GPA. As far as acceptance into the medical school, the admissions committee would consider their academic performance and the interview, but there were no guarantees. Frederick testified that early in spring she began informing potential students that the academic criteria for admission to the medical school would be changing. She testified that, once Dr. Hansen informed her of the new medical school acceptance policy, she began conveying this information to prospective applicants and individuals already accepted into the Program, as well as to last-minute admittees. She stated that she informed plaintiffs Hingarh, Sadrieh, and Nibbe of the change in admissions to the medical school.

On cross-examination, Frederick agreed that she was often asked what academic criteria were needed to gain admission to defendant's medical school. Frederick admitted that she could have informed applicants that, historically, a 3.0 GPA was sufficient for acceptance into the medical school.

Christine Jones, defendant's director of admissions and records, and Tamara Cochran, administrative assistant for Dr. Hansen, denied telling any prospective students that a 3.0 GPA would be sufficient for acceptance into defendant's medical school.

After closing arguments, the trial court ruled that plaintiffs failed to sufficiently prove the elements of common-law fraud and statutory fraud under the Consumer Fraud Act and entered judgment on behalf of defendant on those two counts. As to the contract claim, the trial court found that a valid contractual agreement existed between plaintiffs and defendant to admit qualified Program graduates into defendant's medical school. The trial court contemplated Booden's testimony regarding the purpose of the Program, i.e., "creating an opportunity for students who otherwise might not meet criteria for acceptance into medical school to give them an opportunity to prove themselves capable of undertaking a medical school curriculum," as well as the historical exhibit demonstrating the number of individuals who completed the Program, the number of those accepted into defendant's medical school, and the average GPA of those accepted

students. The trial court found plaintiffs' testimony credible concerning representations made to them by employees of defendant and the students willing to answer questions about defendant's Program and medical school. The trial court also found that the July 22 policy revision was a material change in policy and, as a result, denied the students "in *** an arbitrary fashion the opportunity to pursue [the] medical school curriculum." The trial court determined that plaintiffs reasonably relied upon those statements to their detriment, which formed the basis for an implied contract. The trial court ruled that defendant breached the implied contract to admit plaintiffs to its medical school when plaintiffs demonstrated their ability to perform. The trial court ruled against defendant as to its affirmative defense of waiver.

On July 17, 1997, the trial court issued an order incorporating its prior oral ruling from the trial. The trial court determined that defendant breached the contract with plaintiffs by denying plaintiffs admission to its medical school arbitrarily based solely on their grade point average being ranked below the top 50. The trial court further found that the denial of admission to medical school was a unique harm for which no adequate remedy at law existed and determined that equitable relief was appropriate. Finally, the trial court reiterated its ruling in favor of defendant on the counts based on the Consumer Fraud Act and common-law fraud. Plaintiffs appeal; defendant also appeals.

■ The standard of review we apply when a challenge is made to the trial court's ruling following a bench trial is whether the trial court's judgment is against the manifest weight of the evidence. *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995); *Tampam Farms, Inc. v. Supervisor of Assessments*, 271 Ill. App. 3d 798, 801-02 (1995). A judgment is against the manifest weight of the evidence when an opposite conclusion is apparent or when findings appear to be unreasonable, arbitrary, or not based on evidence. *Bazydlo*, 164 Ill. 2d at 215. The trial court's finding must be given great deference because the trial court, as the trier of fact, is in an optimum position to observe the demeanor of witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive. *Tampam Farms*, 271 Ill. App. 3d at 801-02.

We turn first to the issue raised in defendant's appeal, *i.e.*, whether the trial court erred in finding that an implied contract existed and whether a subsequent breach by defendant occurred. In the alternative, defendants argue that plaintiffs waived their right to seek relief by attending classes and finishing the Program. Plaintiffs assert that the trial court was correct in finding that an implied contract existed, that defendant was in breach, and that defendant's decision set forth in its July 22, 1996, memorandum was made arbitrarily.

■ A contractual relationship exists between a college or university and its students, and the terms of the contract are generally set forth in the school's catalogs, bulletins, and brochures. *Frederick v. Northwestern University Dental School*, 247 Ill. App. 3d 464, 471 (1993). An implied contract arises where the intention of the parties is not expressed but an agreement in fact creating an obligation is implied or presumed from their acts—in other words, where circumstances under common understanding show a mutual intent to contract. *Foiles v. North Greene Unit District No. 3*, 261 Ill. App. 3d 186, 190 (1994). The contractual relationship between the school and its students places duties upon both parties; these duties cannot be arbitrarily disregarded and may be judicially enforced. *Frederick*, 247 Ill. App. 3d at 471.

■ In Illinois, two types of implied contracts are recognized: those implied in fact and those implied in law. *River Park, Inc. v. City of Highland Park*, 281 Ill. App. 3d 154, 168 (1996). A contract implied in fact contains all of the elements of an express contract, as well as a meeting of the minds. *Foiles*, 261 Ill. App. 3d at 190. Contracts implied in law (quasi-contracts) result, notwithstanding the parties' intentions, from a duty imposed by law and are contracts merely in the sense that they are created and governed by principles of equity. *People ex rel. Hartigan v. Knecht Services, Inc.*, 216 Ill. App. 3d 843, 851 (1991); see also *Steinberg v. Chicago Medical School*, 69 Ill. 2d 320, 334 (1977). Furthermore, no claim of a contract implied in law can be asserted when an express contract or a contract implied in fact exists between the parties and concerns the same subject matter. *Zadrozny v. City Colleges*, 220 Ill. App. 3d 290, 295 (1991); *Knecht Services, Inc.*, 216 Ill. App. 3d at 851. Finally, if a court is able to ascertain the intent of the parties using the proper rules of construction and principles of equity, then the contract is sufficiently definite and certain to be enforceable. *Halloran v. Dickerson*, 287 Ill. App. 3d 857, 868 (1997).

In the present·case, therefore, plaintiffs had to prove the existence of the essential elements of a contract implied in fact, conveyed by implication from the parties' conduct or actions. See *Reese v. Forsythe Mergers Group, Inc.*, 288 Ill. App. 3d 972, 979 (1997). The elements of a contract are an offer, a strictly conforming acceptance to the offer, and supporting consideration. *Halloran*, 287 Ill. App. 3d at 867-68; *Ogle v. Hotto*, 273 Ill. App. 3d 313, 319 (1995).

■ The trial court found that "[t]he purpose of the Program was to get *** into medical school." The trial court took particular notice of a stipulated exhibit, which showed an historical overview of the Program. The trial court specifically noted that, in 1993-94, 68 out of the 73 students who successfully completed the Program were admit-

ted to defendant's medical school; in 1994-95, all of the 69 students who successfully completed the Program were admitted to defendant's medical school; and in 1995-96, 80 out of the 81 students who successfully completed the Program were admitted to defendant's medical school. The trial court found that an enforceable contract implied in fact existed between plaintiffs and defendant and included Booden's "idea of creating an opportunity for students who otherwise might not meet criteria for acceptance into medical school to give them an opportunity to prove themselves capable of undertaking a medical school curriculum."

Upon our review of the record, we determine that the trial court's decision was not against the manifest weight of the evidence.

■ Defendant argues that if a contract does exist between it and plaintiff, it is entirely contained within its catalog and brochure. Defendant's brochure for the 1995-96 Applied Physiology Program states in part:

"Historically, approximately 65% of the Program's matriculants have successfully completed the Program and received the Master of Science degree. Of these graduates, the majority have been accepted to a medical school. Completion of the M.S. degree does not automatically make a student eligible for entry into the Ph.D. or M.D. Programs at this or any other University. Admission to the Ph.D. or M.D. Programs requires submission of new applications and is based upon appropriate evaluation by the respective admissions committee."

Defendant's brochure for the 1996-97 Applied Physiology Program now states in part:

"Historically, students in this Program have had excellent academic success; with approximately 65% of the matriculants receiving the M.S. degree. Completion of the M.S. degree does not automatically qualify the student eligible for entry into any other University Program. However, because of the traditional excellence of Program graduates, the Admissions Committee of The Chicago Medical School anticipates acceptance of as many as fifty (50) Applied Physiology graduates into the first year medical class in the following year."

We find defendant's position lacks merit. First, the subsequent clarification in the new brochure evidences the patent abstruseness in the 1995-96 brochure and, therefore, cannot be the sole basis for concluding that the contract is entirely contained within its catalog and brochure. Second, the brochure for defendant's medical school applicable to the present case is entirely silent in its admission policies and procedures for students who have successfully completed the Program and are seeking admission. Third, documents distributed by

a school are only a *part* of the contract between the student and the school. *Johnson v. Lincoln Christian College*, 150 Ill. App. 3d 733, 738 (1986).

■ Defendant next argues that no breach occurred. A student may have a remedy for breach of contract when it is alleged that an adverse decision concerning the student, supposedly for academic deficiencies, was made arbitrarily, capriciously, and in bad faith. *Frederick*, 247 Ill. App. 3d at 471, citing *Wilson v. Illinois Benedictine College*, 112 Ill. App. 3d 932, 937 (1983). To determine whether defendant breached its contract with plaintiffs, plaintiffs must establish, in addition to the existence of a valid and enforceable contract, (1) plaintiffs' performance of the required conditions; (2) defendant's breach; and (3) damages as a result of defendant's breach. *Barille v. Sears Roebuck & Co.*, 289 Ill. App. 3d 171, 175 (1997). Plaintiffs must also establish that the adverse decision concerning them was made arbitrarily, capriciously, and in bad faith. See *Frederick*, 247 Ill. App. 3d at 471, citing *Wilson*, 112 Ill. App. 3d at 937. In the present case, plaintiffs bear the burden of showing that defendant's conduct was " 'without any discernible rational basis.' " *Frederick*, 247 Ill. App. 3d at 471-72, quoting *Holert v. University of Chicago*, 751 F. Supp. 1294, 1301 (N.D. Ill. 1990). The trial court found that all plaintiffs graduated from the Program with a GPA of 3.0 or higher, satisfying the performance factor. The inquiry then became whether defendant's actions of accepting only the top 50 Program graduates and rejecting plaintiffs for admission into defendant's medical school were made arbitrarily, capriciously, and in bad faith, constituting a breach of their contract implied in fact.

■ The record reflects that plaintiffs were not informed of defendant's decision until on or after the first day of orientation, July 22, 1996. Consideration must support a modification of an agreement. *Flint v. Court Appointed Special Advocates of Du Page County, Inc.*, 285 Ill. App. 3d 152, 162 (1996). Viewing the instant bargain as a valid and enforceable agreement, we conclude, as the trial court did, that plaintiffs proved that defendant's unilateral attempt to modify the agreement and implement it two weeks later, July 22, 1996, was arbitrary, capricious, and in bad faith. The benefit derived from defendant's attempted modification of the contract was unilateral, inuring to the benefit of defendant only. Moreover, consideration was lacking. The trial court also found that defendant's decision was inconsistent with defendant's purpose of the Program.

The trial court discussed plaintiffs' damages as a result of defendant's breach, including terminating their employment; breaking their rental leases; purchasing airline tickets, vehicles, and furniture; leasing new living quarters; and jeopardizing their personal relation-

ships. The trial court determined, therefore, that defendant was obliged to honor its original agreement with these plaintiffs. Upon our review of the record, we find that the trial court's decision was not against the manifest weight of the evidence.

■ Alternatively, defendant argues that plaintiffs have waived their right to relief because they remained in the Program even after receiving the July 22, 1996, memorandum. The trial court disagreed and found that defendant failed to undertake any positive administrative steps to change what had apparently been a long-standing procedure and failed to make any effort to contact and inform the prospective students of the proposed change when it had two weeks to do so. We hold that the trial court's decisions in finding (1) an enforceable contract implied in fact between plaintiffs and defendant, (2) a subsequent breach by defendant, and (3) no waiver on the part of plaintiffs were not against the manifest weight of the evidence.

For their appeal, plaintiffs contend that the trial court erred in finding that defendant did not violate any provisions of the Consumer Fraud Act. Plaintiffs argue that defendant's actions of inducing students to apply for admittance into the Program by representing that successful completion would result in admission to its medical school and then reneging on the first day of orientation constituted a violation of the Consumer Fraud Act. Defendant argues that no deceptive act occurred, that it made no promise of future admission, and that no deception occurred regarding its decision to admit the top 50 graduates of the Program. Defendant further argues that it did not intend for plaintiffs to rely on its past practice of accepting nearly every graduate of the Program with a 3.0 or better GPA.

■ The Consumer Fraud Act provides broader consumer protection than the common-law action of fraud by prohibiting any deception or false promise. *Smith v. Prime Cable*, 276 Ill. App. 3d 843, 856 (1995). Therefore, to state a cause of action for statutory fraud, a party need not prove all the elements of common-law fraud. *Salkeld v. V.R. Business Brokers*, 192 Ill. App. 3d 663, 677 (1989). Generally, to establish a violation of the Consumer Fraud Act, plaintiffs must establish that (1) defendant committed a deceptive act, such as the misrepresentation or concealment of a material fact; (2) defendant intended to induce plaintiffs' reliance on the deception; and (3) the deception occurred in a course of conduct involving trade or commerce. *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 501 (1996), citing *Siegel v. Levy Organization Development Co.*, 153 Ill. 2d 534, 542 (1992); see also *Bernhauser v. Glen Ellyn Dodge, Inc.*, 288 Ill. App. 3d 984, 990 (1997). Plaintiffs' actual reliance is not required, but plaintiffs must show that defendant's consumer fraud proximately caused their injury. *Con-*

*nick*, 174 Ill. 2d at 501. Finally, the allegations of plaintiffs' complaint must be as particular and specific as that required under common-law fraud. *Connick*, 174 Ill. 2d at 501, citing *People ex rel. Hartigan v. E&E Hauling, Inc.*, 153 Ill. 2d 473, 492 (1992); see also *Perona v. Volkswagen of America, Inc.*, 292 Ill. App. 3d 59, 65 (1997).

In the present case, the evidence clearly shows, as the trial court found, that defendant's two-week silence surrounding its decision to restrict admission to its medical school to the top 50 Program graduates was a concealment of a "most" material fact. Defendant had two weeks in which to contact approximately 100 students to inform them it would be accepting only the top 50 students from the Program into its medical school, regardless of whether they achieved a 3.0 or better GPA. The testimony and evidence adduced at trial reflected that defendant had access to each student's telephone number where they could be reached at any time, yet no evidence was presented that even one student was made aware of this information until the first day of orientation.

The record also reflects defendant's intent to deceive plaintiffs in that the testimony showed defendant, at least two weeks prior to July 22, 1996, knew that it would be accepting only the top 50 students from the Program into its medical school. Yet defendant, through its staff, routinely informed prospective students, including plaintiffs, that students graduating with a 3.0 or better GPA were likely to be admitted to its medical school. By furnishing this information, defendant undoubtedly knew that its pool of applicants to the Program would ostensibly be enhanced. This implies an intent to deceive. See *Smith*, 276 Ill. App. 3d at 858; see also *Connick*, 174 Ill. 2d at 503-04.

The record also reflects that the statements were made in the course of trade or commerce. Our supreme court has held that the Consumer Fraud Act applies to the sale of educational services. See *Scott v. Ass'n for Childbirth at Home, International*, 88 Ill. 2d 279, 284-85 (1981). Lastly, plaintiffs have shown proximate cause. The evidence showed that, after plaintiffs had communicated with defendant and were told that students who have graduated from the Program with a 3.0 or better GPA had a 90% to 95% likelihood of being accepted into defendant's medical school, they applied for admission to the Program, they accepted defendant's offer of admission into the Program, and they proceeded to matriculate into the Program.

█ Generally, we would agree that a violation of the Consumer Fraud Act occurred. However, the Consumer Fraud Act " 'does not apply to every situation where *** the only actual controversy is whether an isolated breach of contract occurred.' " *Lake County Grading Co. of Libertyville, Inc. v. Advance Mechanical Contractors, Inc.*, 275 Ill. App.

3d 452, 458 (1995), quoting *Century Universal Enterprises, Inc. v. Triana Development Corp.*, 158 Ill. App. 3d 182, 198 (1987). Presumably, our legislature did not enact the Consumer Fraud Act to encompass all commercial transactions (*Doherty v. Kahn*, 289 Ill. App. 3d 544, 564 (1997)) or to supplement every type of contract action (*Lake County Grading*, 275 Ill. App. 3d at 459). A breach of contract, without more, is insufficient to sustain a cause of action cognizable under the Consumer Fraud Act. *Lake County Grading*, 275 Ill. App. 3d at 459. Our review of the pleadings and report of proceedings in the present case leads us to conclude that plaintiffs' cause of action lies primarily in contract. Therefore, applying the rationale of *Lake County Grading* is appropriate.

Reviewing courts in Illinois as well as federal district courts have uniformly held that claims under the Consumer Fraud Act must satisfy the "consumer nexus test." This court has stated:

"[W]here a plaintiff attempts to allege a violation of the [Consumer Fraud] Act in a case which appears on its face to involve only a breach of contract, the relevant inquiry is 'whether the alleged conduct [involves trade practices addressed to the market generally or otherwise] implicates consumer protection concerns.' " *Lake County Grading*, 275 Ill. App. 3d at 459, quoting *Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.*, 190 Ill. App. 3d 524, 534 (1989).

Neither the Consumer Fraud Act nor its legislative history provides definitional parameters for the phrase "implicates consumer protection concerns." Additionally, our supreme court has not taken the opportunity to examine the phrase. We note that our legislature intended that any gaps in the Consumer Fraud Act be supplied by judicial construction. *Hurlbert v. Cottier*, 56 Ill. App. 3d 893, 896 (1978). Therefore, pursuant to its section 11a, we are to construe the Consumer Fraud Act liberally to effectuate its purposes. 815 ILCS 505/11a (West 1996). Section 2 of the Consumer Fraud Act directs us to consider interpretations of federal law, that is, section 5(a) of the Federal Trade Commission Act (15 U.S.C.A. § 45(a) (West 1997)). 815 ILCS 505/2 (West 1996).

In *Athey Products Corp. v. Harris Bank Roselle*, 89 F.3d 430 (7th Cir. 1996), the United States Court of Appeals, Seventh Circuit, looked to *Lake County Grading*, in which the claim appeared to be nothing more than a breach of contract between the parties, and determined that a party wishing to initiate a claim under the Consumer Fraud Act must allege some nexus between the complained-of conduct and consumer protection concerns. *Athey Products Corp.*, 89 F.3d at 436-37. We are aware that the 1990 amendment to the Consumer Fraud

Act dispensed with any requirement previously imposed by the courts that a plaintiff prove a public injury, a pattern, or an effect on consumers generally to maintain an action under the Consumer Fraud Act. See *Lake County Grading*, 275 Ill. App. 3d at 458-59. However, the 1990 amendment simply clarified the legislative intent that a plaintiff suing under the Consumer Fraud Act could state a claim based upon a single, isolated injury and based solely upon the plaintiff's own injury. *Athey Products Corp.*, 89 F.3d at 436, citing *Rubin v. Marshall Field & Co.*, 232 Ill. App. 3d 522, 532 (1992). Thus, the 1990 amendment did not eliminate the requisite connection to consumers.

We are persuaded by the reasoning enunciated in *Lake County Grading* and *Athey Products Corp.* and hold that, depending upon the nature of the case, when a claim under the Consumer Fraud Act is premised upon a breach of contract, a party must allege some nexus between the complained-of conduct and consumer protection concerns; furthermore, the complaining party also bears the burden to prove, by clear and convincing evidence, how the complained-of conduct implicates consumer protection concerns.

■Viewing plaintiffs' complaint in light of the *Lake County Grading* and *Athey Products Corp.* standards, we conclude that defendant's conduct does fall within the confines of the Consumer Fraud Act. Consumer protection concerns are inherently implicated in a contract between an educational institution and its student. Defendant's conduct—luring prospective students into its Applied Physiology Program with the understanding that 90% to 95% of those matriculated students who achieve a 3.0 or better GPA upon graduation would be accepted into its medical school, only to notify them on the first day of orientation of its policy change to accepting only the top 50 students—certainly implicates consumer protection concerns.

Unfortunately, plaintiffs' complaint is deficient in that they have failed to plead an implication of consumer protection concerns. To sufficiently establish an implication of consumer protection concerns, plaintiffs must plead and otherwise prove (1) that their actions were akin to a consumer's actions to establish a link between them and consumers; (2) how defendant's representations regarding their chances of being accepted into defendant's medical school concerned consumers other than themselves; (3) how defendant's particular breach of denying them admission into defendant's medical school involved consumer protection concerns; and (4) how the requested relief would serve the interests of consumers. After hearing all of the testimony and reviewing the evidence, the trial court ruled that plaintiffs failed to prove that a violation of the Consumer Fraud Act occurred. Plaintiffs evidently failed to allege and prove the necessary

nexus between defendant's complained-of conduct and consumer protection concerns. After reviewing the record, we find that the trial court's decision was not against the manifest weight of the evidence.

Because of our disposition concerning plaintiffs' claim under the Consumer Fraud Act, we decline to address the issue of whether plaintiffs' counsel is entitled to attorney fees pursuant to the Consumer Fraud Act. We hold that the trial court did not abuse its discretion in denying fees to plaintiffs' counsel.

Plaintiffs' second claim of error is that the trial court erred in holding that no violations of common-law fraud existed. To state a cause of action for common-law fraud, plaintiff must allege the following elements: " '(1) a false statement of material fact; (2) the party making the statement knew or believed it to be untrue; (3) the party to whom the statement was made had a right to rely on the statement; (4) the party to whom the statement was made did rely on the statement; (5) the statement was made for the purpose of inducing the other party to act; and (6) the reliance by the person to whom the statement was made led to that person's injury.' " *Cramer v. Insurance Exchange Agency*, 174 Ill. 2d 513, 529 (1996), quoting *Siegel*, 153 Ill. 2d at 542-43. The factual allegations must be pleaded with specificity, particularity, and certainty (*Simon v. Wilson*, 291 Ill. App. 3d 495, 505 (1997)), including allegations setting out "what misrepresentations were made, when they were made, who made the misrepresentations and to whom they were made" (*Connick*, 174 Ill. 2d at 497). Plaintiffs bear the burden of proving, by clear and convincing evidence, their allegations of fraud. *Lidecker v. Kendall College*, 194 Ill. App. 3d 309, 314 (1990), citing *In re Application of Rosewell*, 106 Ill. 2d 311, 318 (1985).

The manifest weight of the evidence indicates that the trial court was correct in determining that plaintiffs failed to prove their allegations of common-law fraud by clear and convincing evidence. Initially, we note that plaintiffs' allegations for common-law fraud are inadequate. See *Connick*, 174 Ill. 2d at 497-98. Simply alleging that an agency relationship exists or that "[d]efendant intended to deceive the Students and the plaintiff class members" is insufficient pleading. See *Connick*, 174 Ill. 2d at 498, citing *Knapp v. Hill*, 276 Ill. App. 3d 376, 382 (1995). Plaintiffs' allegations, without more, are legal conclusions and as such are insufficient to support a finding that defendant's representatives had the requisite authority to act on behalf of defendant. See *Connick*, 174 Ill. 2d at 497-99.

At trial, plaintiffs testified regarding their various conversations with defendant's staff, administrators, and former students of the Program. However, the trial court apparently was not persuaded that

162

plaintiffs proved by clear and convincing evidence that the parties making the alleged misrepresentations knew or believed what they were saying to be untrue. The trial court found in favor of defendant, stating that defendant's representations and past conduct were not tantamount to common-law fraud. After reviewing the record in its entirety, we hold that the trial court's conclusion that plaintiffs failed to prove common-law fraud by clear and convincing evidence was not against the manifest weight of the evidence.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

COLWELL and RATHJE, JJ., concur.