# Illinois Official Reports

## Appellate Court

*Trapani Construction Co. v. The Elliot Group, Inc.*, 2016 IL App (1st) 143734

| | |
|---|---|
| Appellate Court Caption | TRAPANI CONSTRUCTION COMPANY, INC., an Illinois Corporation, Plaintiff-Appellee, v. THE ELLIOT GROUP, INC., an Illinois Corporation; ARLINGTON MARKET, LLC, an Illinois Limited Liability Company; and PARKWAY BANK AND TRUST, INC., Defendants (The Elliot Group, Inc., an Illinois Corporation, Defendant-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-14-3734 |
| Filed | September 23, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-CH-51534; the Hon. Franklin U. Valderrama, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | George S. Bellas and Misty J. Cygan, both of Bellas & Wachowski, of Chicago, for appellant.<br><br>Michael J. Wall and John D. Silk, both of Rothschild, Barry & Myers LLP, of Chicago, for appellee. |
| Panel | JUSTICE REYES delivered the judgment of the court, with opinion.<br>Justices Lampkin and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant The Elliot Group, Inc. (defendant),[1] a real estate developer, appeals on order of the circuit court of Cook County entering judgment in favor of and awarding $257,764.70 to plaintiff Trapani Construction Co., Inc. (plaintiff), a general contractor. On appeal, defendant asserts the trial court erred in finding a contract implied in fact existed between the parties because (1) defendant never accepted plaintiff's offer to provide construction services, (2) an unsigned draft contract dated July 5, 2007, required defendant's acceptance by signature, and (3) defendant sufficiently disclosed to plaintiff it was acting as an agent of Arlington Market, LLC (Arlington Market), the owner of the property. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3    In early July 2007, plaintiff sent a draft contract to defendant indicating plaintiff would provide construction services to defendant on the property located at Kensington Road and Dryden Road in Arlington Heights, Illinois (the property), for a project known as the "Arlington Market Site Work" (the project). Defendant was listed as the project owner but did not sign the contract. Nevertheless, plaintiff commenced and completed the work pursuant to the terms of the contract. During the course of plaintiff's performance, payments totaling $2,042,846.50 were approved and made to plaintiff based on its payment requests to defendant. Plaintiff, however, was not paid in full and requested defendant pay the remaining $257,764.70 for its work performed on the project. Defendant refused.

¶ 4    On December 22, 2009, plaintiff filed a three-count complaint against defendant, Arlington Market, and Parkway Bank & Trust Co. (Parkway Bank),[2] alleging foreclosure of mechanic's lien (count I), breach of contract (count II), and unjust enrichment, in the alternative (count III). Count I was dismissed by the trial court, and as a result Parkway Bank was dismissed from the case. On April 22, 2014, a bench trial commenced on counts II and III. On April 23, 2014, plaintiff dismissed its claim against Arlington Market and proceeded against defendant alone. At the conclusion of plaintiff's case-in-chief, defendant moved for a directed verdict. The trial court denied defendant's motion on count II. Plaintiff voluntarily dismissed count III with prejudice. Thereafter, on May 7, 2014, plaintiff filed a one-count amended complaint alleging that defendant's refusal to pay the remaining $257,764.70 constituted a breach of contract implied in fact.

¶ 5    No transcript of the bench trial appears in the record on appeal. The parties, however, stipulated to a bystander's report that summarized the trial proceedings pursuant to Illinois Supreme Court Rule 323(c) (eff. Dec. 13, 2005), which was certified by the trial court. The following facts were adduced at trial.

¶ 6                                 A. Plaintiff's Evidence

¶ 7    Plaintiff presented the following evidence. Plaintiff had performed work for defendant as a general contractor on other construction projects prior to this project. On these occasions,

---

[1]Defendant is referred to as "The Elliott Group, Inc.," in the parties' briefs and the record on appeal.
[2]Arlington Market and Parkway Bank are not parties to this appeal.

plaintiff had performed under an unsigned contract and was paid in excess of $18 million by defendant for its work. Similarly, plaintiff performed under an unsigned contract and was paid in full by defendant for its work on a separate building, which was another part of this project.

¶ 8 On March 1, 2007, plaintiff submitted a proposal to defendant to provide construction services for this project. The proposal indicated plaintiff had "[e]specially prepared" the proposal for "Mr. Lou Elliott, The Elliott Group." Thereafter, plaintiff sent five draft contracts to defendant indicating plaintiff would provide construction services to defendant for the work at issue.[3] Defendant was listed as a contracting party in all five draft contracts. None of the draft contracts were ever executed.

¶ 9 The last draft contract forwarded to defendant by plaintiff was dated July 5, 2007. Plaintiff's witnesses testified defendant had provided plaintiff with landscape drawings and civil drawings for the work at issue and that the drawings were attached to and made part of the draft contract dated July 5, 2007. Plaintiff's proposal was also attached to the draft contract as a "contract document."

¶ 10 Plaintiff's witnesses testified that, in early July 2007, plaintiff commenced performing on the work at issue.[4] Plaintiff's witnesses further testified the project specifications were provided by defendant and prepared by third parties hired by defendant. The project specifications indicated they were prepared at the request of defendant or the Elliott Home Builders. Plaintiff's witnesses asserted plaintiff performed pursuant to the terms and specifications of the draft contract dated July 5, 2007, and the attached documents.

¶ 11 Plaintiff's witnesses also testified plaintiff followed the procedures set out in the draft contract dated July 5, 2007, to obtain payment. The payments were made periodically. For each payment request plaintiff sent to defendant during the course of plaintiff's performance, plaintiff submitted to defendant a contract activity report, a certificate for payment, an application and certification for payment, an application and certificate for payment, and lien waivers. All documents listed defendant and plaintiff as the contracting parties and defendant as the project owner. Payments totaling $2,042,846.50 were approved and tendered to plaintiff based on the payment requests addressed to defendant. The contract amount on the draft contract dated July 5, 2007, matched the amounts on the payment requests and lien waivers plaintiff submitted to defendant.

¶ 12 Maria Weisbruch (Weisbruch), plaintiff's employee, testified she prepared the documents for the payment requests. She stated that Mark Elliott, the president of defendant, would review the payment requests and other related documents with her. Weisbruch further testified defendant would "meticulously review" the payment requests and would often require changes in them before plaintiff was paid. David Cartwright (Cartwright), plaintiff's senior vice president, testified defendant discussed the payment requests with plaintiff.[5] Defendant did not deny receiving these documents or that payments were tendered to plaintiff based on these documents.

---

[3]Plaintiff presented evidence that a "series of draft *** contracts" were sent to defendant. The record indicates plaintiff sent five draft contracts.

[4]The record does not indicate which witnesses provided this testimony.

[5]This testimony is not included in the bystander's report of proceedings, but is in the trial court's order entered on November 6, 2014.

- 3 -

¶ 13    Plaintiff's witnesses also testified plaintiff entered into subcontracts with subcontractors to perform the work required by the draft contract dated July 5, 2007. Each subcontract identified defendant as the project owner and was observed by defendant.

¶ 14    Plaintiff also obtained certificates of insurance for the work at issue and named defendant as an additional insured. All certificates were sent to defendant. Further, defendant was identified as the project owner in certificates of insurance obtained by third parties who were hired by defendant to work on the same project. Cartwright testified plaintiff was required to obtain the certificates of insurance before it could commence work on the project.

¶ 15    Plaintiff's witnesses also testified that during the course of plaintiff's work at issue, 16 written change orders were approved by defendant. Each change order identified defendant as the "owner." Change order No. 16 was signed by Jon Elliott under "The Elliott Group, Inc., Owner."[6] Weisbruch testified plaintiff could not have performed without defendant's approval of the change orders.[7]

¶ 16    Plaintiff's witnesses testified construction progress reports were sent to defendant weekly during plaintiff's performance until January 18, 2008. Further, plaintiff and defendant exchanged "numerous" e-mails and correspondences regarding the work at issue. Thereafter, plaintiff was not paid in full for its work and requested defendant to pay the remaining $257,784.50 it was owed. Defendant refused. Mark Elliot testified in an affidavit that Arlington Market and defendant do not contest the amount of work that was performed by plaintiff.

¶ 17    Plaintiff's witnesses further testified defendant never disclosed to plaintiff that it was acting as the agent of Arlington Market. Plaintiff's witnesses also testified defendant never corrected the subcontracts, certificates of insurance, change orders, construction progress reports, and the documents for payment requests including lien waivers, which listed defendant as the project owner.

¶ 18                              B. Defendant's Evidence

¶ 19    Defendant presented the following evidence. Defendant is an Illinois corporation engaged in the business of real estate development and consulting. In 2004, defendant entered into a contract to purchase the property. Defendant petitioned the Village of Arlington Heights to develop the property for the project, which the Village of Arlington Heights approved.

¶ 20    Thereafter, Arlington Market was formed to own, develop, manage, and sell the property. It was common practice in the residential development industry to establish a "single-purpose LLC" to own the property. In February 2007, defendant assigned its contract for purchase of the property to Arlington Market. On February 28, 2007, Arlington Market obtained a loan from Parkway Bank to finance its purchase and development of the property. On that same day, Arlington Market purchased the property. Arlington Market had no employees and employed defendant to manage its day-to-day affairs. Michael Elliott was employed as an attorney for defendant and attorney and manager for Arlington Market.[8]

---

[6]The record on appeal does not indicate Jon Elliott's relationship with defendant.

[7]This testimony is not included in the bystander's report of proceedings, but is in the trial court's order entered on November 6, 2014.

[8]Michael Elliott is also referred to as "Mike Elliott" in the record on appeal.

¶ 21    Plaintiff sent five draft contracts to defendant for the work at issue. Michael Elliott testified he instructed Abe Treger, an attorney, to prepare riders that listed the "owner" as Arlington Market (the riders). The riders indicated they were made a part of the draft contracts and "shall control and supersede" the terms and conditions of the draft contracts. Michael Elliott testified that, on June 6, 2007, the riders were e-mailed to Cartwright. The riders were never signed by plaintiff and Arlington Market. Defendant did not submit any e-mails or corroborating evidence that the riders were sent to plaintiff.

¶ 22    On July 10, 2007, the parties met to negotiate the terms of the draft contract dated July 5, 2007, but the contract was never signed.

¶ 23    The following day, on July 11, 2007, plaintiff sent a letter to defendant. In the letter, plaintiff confirmed the parties had not reached an agreement on the terms of the draft contract dated July 5, 2007. Nevertheless, plaintiff stated it had already started working on the project and requested the first payment.

¶ 24    On July 16, 2007, Mark Elliott responded by letter to plaintiff. In the letter, Mark Elliott stated, in its entirety, the following:

> "Thanks for meeting with us on Tuesday. We also agree that the meeting was very productive and should put both sides on the right track as we move forward at Arlington Market. I've had a chance to talk to Lou about the points in [*sic*] you raised in your July 11th letter. We agree with all of your proposed modifications and will ask Mike Elliott to make the appropriate contract changes. If you have any question[s], feel free to call me."

The letter was signed, "Arlington Market, LLC, by Mark Elliott, as Manager." The letterhead read, "The Elliott Group Inc."

¶ 25    Aside from the discussions about the draft contracts with defendant, plaintiff entered into a "Construction Loan Escrow Trust and Disbursing Agreement" (the construction escrow agreement) with Arlington Market, Parkway Bank, and Chicago Title Insurance Company (Chicago Title). The construction escrow agreement provided as follows:

> "Owner/Borrower has executed/will execute a mortgage/trust deed *** for the purpose of financing, in whole or in part, the construction of or the rehabilitation of improvements thereon (the Project).
>
> * * *
>
> The undersigned agree that this Agreement is not intended by any of the undersigned to give any benefits, rights, privileges, actions or remedies to any person, partnership, firm or corporation other than Escrow Trustee, Lender, and Owner/Borrower as a third party beneficiary or otherwise under any theory of law.
>
> * * *
>
> The undersigned has received and reviewed the foregoing Agreement and acknowledges that ___ is neither a party to the said Agreement, nor does that Agreement confer any benefits, rights, privileges, actions or remedies to any person, partnership, firm or corporation other than Escrow Trustee, Lender, and Owner/Borrower under a third party beneficiary theory or otherwise under any theory of law."

The "project name" was identified as "Arlington Market Site Development." The construction escrow agreement was signed by Arlington Market as owner, by Parkway Bank

as lender, by Chicago Title as escrowee, and by plaintiff as general contractor. Weisbruch signed the construction escrow agreement on behalf of plaintiff. Defendant did not sign the agreement.

¶ 26    Plaintiff sent eight payment requests to defendant during the course of plaintiff's performance. In response to plaintiff's first seven payment requests, Chicago Title wrote checks or executed wire transfer to plaintiff at the direction of Arlington Market, using funds provided by Parkway Bank. The last payment request paid to plaintiff was in June 2008. Plaintiff submitted its eighth payment application to defendant in September 2008, which defendant accepted. Arlington Market approved plaintiff's eighth payment application, but Parkway Bank refused to fund the payment.

¶ 27    Michael Elliott acknowledged in his testimony that plaintiff's work at issue was approved by defendant, but further testified defendant had acted only as a development consultant for Arlington Market.

¶ 28                                    C. Trial Court's Order

¶ 29    On November 6, 2014, the trial court entered an order finding in favor of and awarding $257,764.70 to plaintiff. The trial court stated, "while it is undisputed that the contract [plaintiff] sent to [defendant] was never signed by [defendant], the actions of the parties showed an agreement was formed." The trial court specifically noted plaintiff submitted payment requests to defendant and was paid $2,041,846.50 in accordance with the draft contract dated July 5, 2007. The trial court further noted defendant did not provide any evidence that plaintiff's proposal was rejected or that plaintiff was instructed to cease performance at any time.

¶ 30    In addition, the trial court determined defendant was personally liable on the contract implied in fact because "the overwhelming evidence shows that [defendant] did not disclose its agency relationship with Arlington Market to [plaintiff]." The trial court reasoned no evidence was presented to demonstrate defendant had informed plaintiff it was not the project owner or that it had corrected plaintiff's references to defendant as the owner. The trial court further found Michael Elliott's testimony, that riders listing Arlington Market as the "owner" were e-mailed to plaintiff, was lacking in credibility because (1) Michael Elliott did not testify as to who sent the e-mail, (2) defendant did not provide e-mails or other evidence to establish that plaintiff received the riders, and (3) Cartwright testified he had never received the riders. This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32    On appeal, defendant contends (1) there was no contract implied in fact between plaintiff and defendant, (2) the draft contract dated July 5, 2007, required acceptance by signature, and (3) defendant was acting on behalf of Arlington Market as its agent. We reiterate that there are no transcripts of the trial within the record on appeal. It is defendant's duty, as the appellant, to present a sufficiently complete record of the trial court proceedings to support its claim of error. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391 (1984). In the absence of such a record, we will presume the trial court's judgment was in conformity with the law and with sufficient factual basis. *Id.* at 392. Any doubts arising from the incompleteness of the record will be resolved against the appellant. *Id.* (citing *Block & Co. v. Storm Printing Co.*, 40 Ill. App. 3d 92, 96 (1976), and *Sandberg v. American Machining Co.*, 31 Ill. App. 3d 449, 452

(1975)). Accordingly, this court will rely on the bystander's report and documents submitted within the record on appeal but, in the absence of a record of what occurred in the trial court, we will presume the trial court acted in conformity with the law and with sufficient factual basis. See *Foutch*, 99 Ill. 2d at 391-92.

¶ 33                                              A. Standard of Review

¶ 34       Defendant argues the standard of review is *de novo* because the questions before this court are "pure questions of law." Plaintiff asserts this case should be reviewed under a manifest weight of evidence standard because "the trial court's findings of fact [should] be reviewed deferentially."

¶ 35       Generally, whether a contract implied in fact exists is a question of law, the determination of which is reviewed *de novo*. *Wood v. Wabash County*, 309 Ill. App. 3d 725, 727-28 (1999). The existence of an implied contract, however, depends on the facts, circumstances, and expressions by parties demonstrating an intent to be bound. *People ex rel. Hartigan v. Knecht Services, Inc.*, 216 Ill. App. 3d 843, 851 (1991). When those facts are disputed, the existence of a contract is a question for the trier of fact to decide. *Quinlan v. Stouffe*, 355 Ill. App. 3d 830, 836 (2005). Moreover, whether the parties intended to enter into a contract is a question of fact left to the trial court. *Seymour v. Williams*, 249 Ill. App. 3d 264, 270 (1993). A reviewing court will not reverse these findings unless it is against the manifest weight of the evidence. *Quinlan*, 355 Ill. App. 3d at 836.

¶ 36       Furthermore, "[w]here a trial judge has heard witnesses give oral testimony, his findings will not be disturbed unless they are plainly erroneous and contrary to the manifest weight of the evidence." *Johnson v. Fischer*, 108 Ill. App. 2d 433, 437 (1969) (citing *Village of Glencoe v. Jackson*, 102 Ill. App. 2d 65, 75 (1968)). "The trial judge who sees the witnesses and hears the evidence is in a much superior position to find the truth than is a reviewing court," and accordingly, the trial judge may decide the weight to be given the testimony and the credibility of the witnesses. *Id.*

¶ 37       A trial court's determination is against the manifest weight of the evidence when an opposite conclusion is apparent or when the judgment appears to be unreasonable, arbitrary, or not based on evidence. *Brody v. Finch University of Health Sciences/The Chicago Medical School*, 298 Ill. App. 3d 146, 153 (1998) (citing *Bazydlo v. Volant*, 164 Ill. 2d 207, 215 (1995)). Moreover, where there is a factual basis for a judgment, it cannot be said that the judgment is contrary to the manifest weight of the evidence. *Cole v. Brundage*, 36 Ill. App. 3d 782, 797 (1976) (citing *Fandrich v. Allstate Insurance Co.*, 25 Ill. App. 3d 301, 314 (1974)).

¶ 38       In this case, facts are in dispute that are essential to determining whether the parties demonstrated an intent to be bound. Defendant maintains Michael Elliott's testimony, that defendant sent the riders listing Arlington Market as the "owner" to plaintiff, demonstrated defendant's intent not to be bound to a contract with plaintiff. Cartwright, however, testified he never received the riders. A contract implied in fact arises where a contractual duty is imposed by the court due to a promissory expression that shows an intention to be bound. *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 93. Thus, contracts implied in fact arise from a promissory expression that may be inferred from the facts and circumstances that demonstrate the parties' intent to be bound. *Heavey v. Ehret*, 166 Ill. App. 3d 347, 354 (1988). Accordingly, the existence of a contract implied in fact in the instant case is a

question for the trier of fact to decide. See *Quinlan*, 355 Ill. App. 3d at 836. This court will not overturn the trial court's judgment unless that judgment is against the manifest weight of the evidence. *Id.* We address the merits of each issue in turn.

¶ 39                                    B. Contract Implied in Fact

¶ 40    Defendant asserts there was no contract implied in fact between plaintiff and defendant because (1) defendant never accepted plaintiff's offer, (2) no consideration was provided to defendant, and (3) there was no meeting of the minds or mutual assent.

¶ 41    Even in the absence of an express contract, an implied contract can be created as a result of the parties' actions. *Kohlenbrener v. North Suburban Clinic, Ltd.*, 356 Ill. App. 3d 414, 419 (2005). In Illinois, two types of implied contracts are recognized, those implied in fact and those implied in law. *Brody*, 298 Ill. App. 3d at 154. Contracts implied in law are "equitable in nature, predicated on the fundamental principle that no one should unjustly enrich himself at another's expense." *In re Estate of Milborn*, 122 Ill. App. 3d 688, 690 (1984) (citing *Arthur Rubloff & Co. v. Drovers National Bank*, 80 Ill. App. 3d 867, 875 (1980)). Contracts implied in fact, as aforementioned, arise from a promissory expression that may be inferred from the facts and circumstances that demonstrate the parties' intent to be bound. *Heavey v. Ehret*, 166 Ill. App. 3d 347, 354 (1988). Thus, "[t]he only difference between an express contract and an implied contract in the proper sense is, that in the former the parties arrive at an agreement by words, either verbal or written, while in the latter the agreement is arrived at by a consideration of their acts and conduct." (Internal quotation marks omitted.) *Litow v. Aurora Beacon News*, 61 Ill. App. 2d 127, 133 (1965).

¶ 42    A contract implied in fact, which applies here, is a true contract. *Matthews*, 2016 IL 117638, ¶ 93. The elements of a contract are an offer, acceptance, and consideration. *Brody*, 298 Ill. App. 3d at 154. Thus, a contract implied in fact contains all of the elements of a contract, including a meeting of the minds. *Id.*

¶ 43    Generally, for a contract to be valid, an acceptance must be objectively manifested; if it is not, there is no meeting of the minds. *Rosin v. First Bank of Oak Park*, 126 Ill. App. 3d 230, 234 (1984); *Brody*, 298 Ill. App. 3d at 154. Acceptance of a contract implied in fact, however, can be proven by circumstances demonstrating that the parties intended to contract and by the general course of dealing between the parties. *Schivarelli v. Chicago Transit Authority*, 355 Ill. App. 3d 93, 101 (2005). Similarly, mutual intent to contract can be established by the ordinary course of dealing and the common understanding of persons. *People ex rel. Hartigan*, 216 Ill. App. 3d at 851.

¶ 44    Based on our review of the record, we conclude the trial court's finding that a contract implied in fact existed between the parties was not against the manifest weight of the evidence for the following reasons.

¶ 45    In the instant case, plaintiff was paid in excess of $18 million by defendant for its work on other construction projects that was performed under similar circumstances, *i.e.*, under unsigned draft contracts. Plaintiff was also paid *in full* by defendant for its work on another building that was part of this particular project, also under an unsigned draft contract. For the work at issue, plaintiff submitted a proposal to defendant and performed pursuant to the terms and specifications in the draft contract dated July 5, 2007. To obtain payment for the work at issue, plaintiff submitted payment requests to defendant which defendant "meticulously review[ed]" before paying $2,041,846.50 to plaintiff in accordance with the

draft contract. Further, defendant approved 16 written contract change orders that allowed plaintiff to continue to work on the project. In addition to these facts, defendant never corrected the subcontracts, certificates of insurance, change orders, weekly construction progress reports, contract activity reports, and documents for payment requests sent by plaintiff that identified defendant as the project owner. Moreover, defendant did not reject plaintiff's work or instruct plaintiff to cease work at any time. In light of this evidence, we find the circumstances and behaviors of the parties demonstrated a general course of dealing and a mutual intent to contract. Accordingly, we find there is ample evidence to support the trial court's ruling that a contract implied in fact existed between the parties. See *Schivarelli*, 355 Ill. App. 3d at 101; *People ex rel. Hartigan*, 216 Ill. App. 3d at 851.

¶ 46    Defendant further argues plaintiff knew Arlington Market was the owner and had agreed to pay for plaintiff's work because plaintiff and Arlington Market had both signed the construction escrow agreement.

¶ 47    Plaintiff asserts defendant "misrepresents the meaning of the escrow agreement that was between the lender, the title company and Arlington Market." Plaintiff claims its signature on the construction escrow agreement "did nothing more than acknowledge [the construction escrow agreement's] existence and it contained no commitment from or to the plaintiff."

¶ 48    When interpreting a contract, the primary goal is to give effect to the parties' intentions at the time the contract was formed. *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 77. The best indication of the parties' intent is ascertained from the plain language of the contract. *Gallagher v. Lenart*, 367 Ill. App. 3d 293, 301 (2006), *aff'd*, 226 Ill. 2d 208 (2007).

¶ 49    A careful reading of the construction escrow agreement reveals there is no express language indicating Arlington Market promised to pay plaintiff, the general contractor, for its work on the project. Rather, the plain language of the construction escrow agreement states the agreement is "not intended by any of the undersigned to give any benefits, rights, privileges, actions, or remedies to any person, partnership, firm or corporation other than Escrow Trustee, Lender, and Owner/Borrower *** under any theory of law." Further, considering that defendant never corrected the payment requests, subcontracts, certificates of insurance, change orders, or weekly construction progress reports that identified defendant as the project owner and that plaintiff was paid seven progress payments based on the payment requests it addressed to defendant, we are unpersuaded by defendant's argument that plaintiff definitely knew Arlington Market was responsible for paying plaintiff simply because it had signed the construction escrow agreement.

¶ 50    Defendant also contends that, based on Michael Elliott's testimony, the riders that listed Arlington Market as the "owner" were e-mailed to Cartwright. Cartwright's testimony, which the trial court credited, however, indicates plaintiff never received the riders.

¶ 51    Here, the trial court found Michael Elliott's testimony was lacking in credibility. As the trial court noted (1) Michael Elliott did not testify as to who sent the e-mail, (2) defendant did not submit any e-mails or provide corroborating evidence that the riders were sent or received by plaintiff, and (3) Cartwright testified he never received the riders. Where the testimony is conflicting in a bench trial, as here, the trial court's findings will not be disturbed unless they are against the manifest weight of the evidence. *Bazydlo*, 164 Ill. 2d at 215. We thus find the trial court's finding as to the credibility of Michael Elliott's testimony was neither unreasonable nor arbitrary. See *Brody*, 298 Ill. App. 3d at 153 (citing *Bazydlo*, 164 Ill. 2d at 215).

¶ 52    For all of these reasons, we conclude the trial court's finding that a contract implied in fact existed between the parties was not against the manifest weight of the evidence. *Id.*

¶ 53                                    C. Signature Requirement

¶ 54    Defendant contends the draft contract dated July 5, 2007, "required acceptance by signature." Plaintiff responds defendant failed to raise this issue before the trial court. Regardless, plaintiff further argues the draft contract did not require a signature to establish defendant's acceptance. Plaintiff also claims plaintiff's performance pursuant to the requirements of the draft contract, the progress payments made to plaintiff, and defendant's "conduct and silence" established that defendant had properly accepted plaintiff's offer.

¶ 55    Generally, an unsuccessful party cannot raise a new theory of recovery for the first time on appeal. *Hudkins v. Egan*, 364 Ill. App. 3d 587, 592 (2006) (citing *Pagano v. Occidental Chemical Corp.*, 257 Ill. App. 3d 905, 911 (1994)). If the issue was not raised in the trial court, the party has not properly preserved the issue, which " 'results in forfeiture of that issue on appeal.' " *Stuckey v. The Renaissance at Midway, Inc.*, 2015 IL App (1st) 143111, ¶ 30 (quoting *In re E.F.*, 2014 IL App (3d) 130814, ¶ 42).

¶ 56    Our review of the record indicates defendant did not raise this issue before the trial court. Accordingly, we find this argument to be forfeited. See *Stuckey*, 2015 IL App (1st) 143111, ¶ 30. Moreover, even if defendant had not forfeited the issue on appeal, its claim would fail. As we have already concluded, the circumstances and behaviors of the parties demonstrated a general course of dealing and a mutual intent to contract. See *Schivarelli*, 355 Ill. App. 3d at 101; see also *Lynge v. Kunstmann*, 94 Ill. App. 3d 689, 694 (1981) ("a signature is not always essential to the binding force of an agreement. *** The object of a signature is to show mutuality or assent, but these facts may be shown in other ways, as, for example, by acts or conduct of the parties."). We thus conclude the trial court's finding that a contract implied in fact existed between the parties was not against the manifest weight of the evidence. See *Brody*, 298 Ill. App. 3d at 153 (citing *Bazydlo*, 164 Ill. 2d at 215).

¶ 57                                         D. Agency

¶ 58    Defendant claims it should not be liable for the judgment entered by the trial court because it had sufficiently disclosed to plaintiff that it was acting as Arlington Market's agent. According to defendant, three documents provided plaintiff with sufficient disclosure: (1) Mark Elliott's letter dated July 16, 2007, which is signed with the Arlington Market signature block, (2) the construction escrow agreement that identifies Arlington Market as the owner, and (3) the riders that allegedly listed Arlington Market as the owner. Defendant further argues plaintiff knew Arlington Market was the owner of the property when it accepted the seven progress payments from Arlington Market.

¶ 59    Plaintiff responds the three documents did not provide plaintiff with sufficient disclosure that defendant was acting as an agent and plaintiff's acceptance of the seven progress payments does not indicate plaintiff knew of the relationship. According to plaintiff, Mark Elliott's letter dated July 16, 2007, did not sufficiently disclose to plaintiff that defendant was acting as Arlington Market's agent because (1) the letterhead indicated the letter was from defendant, (2) the letter referenced the only written contract under discussion, which identified defendant as a contracting party, and (3) the letter did not propose changing the names of the contracting parties. Further, while plaintiff acknowledges the construction

escrow agreement identifies Arlington Market as the owner of the property, plaintiff argues the document was insufficient to provide disclosure because (1) "it did not overcome the fact that almost every other document said something different" and (2) even if plaintiff knew the property was owned by a third party, it did not preclude plaintiff from reasonably believing it was working directly for defendant. Plaintiff further contends it did not know the payments it accepted were made by Arlington Market because the payments were sent directly by Chicago Title from funds deposited by Parkway Bank. Plaintiff also maintains it never received the riders that allegedly identified Arlington Market as the project owner.

¶ 60    Generally, an agent who contracts with a third party on behalf of an undisclosed or partially disclosed principal is personally liable on the contract. *Kimco Corp. v. Murdoch, Coll & Lillibridge, Inc.*, 313 Ill. App. 3d 768, 771-72 (2000). It is well settled that "the duty is upon the agent who wishes to avoid liability to disclose the name or identity of his principal clearly and in such a manner as to bring actual notice to the other party." *Lankton-Ziegle-Terry & Associates, Inc. v. Griffin*, 156 Ill. App. 3d 765, 767 (1987). A principal is undisclosed if the third party does not know the agent is contracting on the principal's behalf. *Kimco Corp.*, 313 Ill. App. 3d at 771. "It is not sufficient that the third party has knowledge of facts and circumstances which would, if reasonably followed by inquiry, disclose the identity of the principal." *Lankton-Ziegle-Terry & Associates, Inc.*, 156 Ill. App. 3d at 767 (citing *Mawer-Gulden-Annis, Inc. v. Brazilian & Columbian Coffee*, 49 Ill. App. 2d 400, 405 (1964)). The reason for this rule is reliance, as the third party is relying on the credit of the agent and not that of the principal when the agent is contracting on behalf of an undisclosed or partially disclosed principal. *Kimco Corp.*, 313 Ill. App. 3d at 772. Agents are not unfairly burdened by such a rule because "they always have it in their power to relieve themselves from such liability, and when they do not, it must be presumed that they intend to be liable." (Internal quotation marks omitted.) *Id.*

¶ 61    We reject defendant's contention that Mark Elliott's letter dated July 16, 2007, the construction escrow agreement, and the riders sufficiently disclosed to plaintiff that defendant was acting as Arlington Market's agent, for the following reasons. First, as noted above, we defer to the trial court's finding that Michael Elliott's testimony regarding the riders was lacking in credibility. See *Bazydlo*, 164 Ill. 2d 207 at 214-15 ("The trial judge, as the trier of fact, is in a position superior to a reviewing court to observe witnesses while testifying, to judge their credibility, and to determine the weight their testimony should receive."). Second, the letter dated July 16, 2007, and the construction escrow agreement do not expressly indicate defendant was acting as Arlington Market's agent, to demonstrate plaintiff had "actual notice." See *Lankton-Ziegle-Terry & Associates, Inc.*, 156 Ill. App. 3d at 767 (it is the agent's duty to disclose the name or identity of his principal clearly to bring "actual notice" to the contracting party). As plaintiff argues, even if we assume plaintiff had learned Arlington Market was the owner of the property from the two documents, it does not preclude plaintiff from reasonably believing it was working directly for defendant. We thus find the two documents are insufficient to demonstrate defendant had actual notice and do not satisfy the disclosure required for defendant to avoid personal liability. See *id.* (disclosure is insufficient where a contracting party has knowledge of facts which would, if followed by reasonable inquiry, disclose the principal's identity).

¶ 62    Further, we reject defendant's argument that plaintiff knew Arlington Market was the owner of the property because it accepted the seven progress payments from Arlington

Market. As plaintiff argues, Arlington Market did not send the payments directly to plaintiff. Chicago Title wrote the checks or executed the wire transfers using funds provided by Parkway Bank. We thus find plaintiff's acceptance of the seven payments was insufficient to demonstrate plaintiff had actual notice. Accordingly, defendant has failed to demonstrate it had sufficiently disclosed to plaintiff that it was acting as an agent of Arlington Market. *Id.*

¶ 63    Rather, our review of the record reveals there is ample evidence demonstrating defendant did not disclose its agency relationship to plaintiff. In the instant case, defendant never corrected the subcontracts, certificates of insurance, change orders, weekly construction progress reports, and documents for payment requests that identified defendant as the project owner. Further, the certificates of insurance, which were required before plaintiff could commence work on the project, listed defendant as an additional insured but did not list Arlington Market. Moreover, based on Weisbruch's testimony, which the trial court accepted, plaintiff submitted the documents for payment requests to defendant and defendant "meticulously review[ed]" the requests before plaintiff was paid. Also, based on Cartwright's testimony, which the trial court credits, defendant discussed the applications for payment with plaintiff. In addition to these facts, 16 change orders were approved by defendant and signed by Jon Elliott under "The Elliott Group, Inc., Owner." Weisbruch's testimony also establishes plaintiff would not have been able to complete the work without defendant's approval of the change orders.

¶ 64    Given the ample evidence demonstrating defendant did not disclose its agency relationship to plaintiff, we find the trial court reasonably concluded defendant is personally liable on the contract implied in fact. See *id.* (the trial court's finding that defendant was personally liable was reasonable where the defendant did not inform the plaintiff he was acting for a third party). We cannot conclude that an opposite conclusion is apparent or that the trial court's findings were unreasonable, arbitrary, or not based on the evidence. Accordingly, we find the trial court's judgment was not against the manifest weight of the evidence. See *Brody*, 298 Ill. App. 3d at 153.

¶ 65                                    III. CONCLUSION

¶ 66    For the reasons stated above, we affirm the judgment of the circuit court of Cook County.

¶ 67    Affirmed.