| **Scharf v Tolley** |
|---|
| 2025 NY Slip Op 31143(U) |
| April 7, 2025 |
| Supreme Court, New York County |
| Docket Number: Index No. 158359/2018 |
| Judge: John J. Kelley |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

# SUPREME COURT OF THE STATE OF NEW YORK
## NEW YORK COUNTY

| | |
|---|---|
| PRESENT: **HON. JOHN J. KELLEY** | PART **56M** |
| *Justice* | |

-------------------------------------------------X

CHARLES SCHARF and AMY SCHARF,

                Plaintiffs,

        - v -

DAVID TOLLEY, NANCY LEE, JILL ALLEGRETTI ESQ.,
and MORICI & MORICI, LLP, as Escrow Agent,

                Defendants.

-------------------------------------------------X

| | |
|---|---|
| INDEX NO. | 158359/2018 |
| MOTION DATE | 01/27/2025  01/27/2025 |
| MOTION SEQ. NO. | 002, 003 |

**DECISION, ORDER +
JUDGMENT ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 002) 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 138, 139, 168, 169, 170, 171, 172, 173, 174, 175, 176, 177, 178, 179, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 204, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 218, 219, 222, 223

were read on this motion to/for              SUMMARY JUDGMENT     .

The following e-filed documents, listed by NYSCEF document number (Motion 003) 92, 93, 94, 95, 96, 97, 98, 99, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 111, 112, 113, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134, 135, 136, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 156, 157, 158, 159, 160, 161, 162, 163, 164, 165, 166, 167, 220, 221, 224

were read on this motion to/for              SUMMARY JUDGMENT     .

## I.    INTRODUCTION

This is an action to recover damages for breach of contract and fraudulent inducement, arising from the sale of shares of stock allocated to an apartment unit in a residential cooperative apartment building (the contract or the contract of sale). The defendants David Tolley and Nancy Lee (together the sellers) move pursuant to CPLR 3212 for summary judgment (a) dismissing the first amended complaint insofar as asserted against them, (b) on their counterclaims to recover damages for breach of contract and for a judgment declaring that the plaintiffs, Charles Scharf and Amy Scharf (together the buyers), had no basis upon which to terminate the contract, that the buyers' failure to appear for a time-of-the-essence closing

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID           Page 1 of 17
Motion No.  002 003

1 of 17

constituted a default of their obligations under the contract, and that the sellers are entitled to payment of the contract deposit, and (c) directing Morici & Morici, LLP, as escrow agent, to release the contract deposit to the sellers (MOT SEQ 002). The buyers oppose the sellers' motion. The buyers separately move for summary judgment (a) on their first cause of action, which seeks to recover for breach of contract against the sellers, (b) dismissing the sellers' breach of contract counterclaim, (c) declaring, with respect to the sellers' declaratory judgment counterclaim, that the buyers had a right under the contract to terminate it and refuse to appear for the closing of title, and (d) awarding them reasonable attorneys' fees and costs (MOT SEQ 003). The sellers oppose the buyers' motion. The sellers' motion is granted, they are awarded summary judgment dismissing the first amended complaint insofar as asserted against them, on their breach of contract counterclaim, and on their counterclaim declaring that the buyers had no basis upon which to terminate the contract and that the buyers' failure to appear for a time-of-the-essence closing constituted a default of their obligations under the contract. The first amended complaint is dismissed insofar as asserted against the sellers, it is declared that the buyers had no basis upon which to terminate the contract and that the buyers' failure to appear for a time-of-the-essence closing constituted a default of their obligations under the contract, and former defendant Morici & Morici, LLP, as escrow agent, is directed to release and pay, to the sellers, the contract deposit in the sum of $1,850,000.[1]

## II.   FACTUAL BACKGROUND

On September 15, 2008, the sellers purchased 1,042 shares of stock in residential cooperative corporation 115 Central Park West Corporation (the cooperative corporation) that was allocated to apartment unit 31-33CD (the unit), in an apartment building located at 115 Central Park West, New York, NY 10023 (the building). Shortly thereafter, the sellers sought to renovate the unit. On November 14, 2008, the sellers executed an alteration agreement with

---

[1] By stipulation dated November 30, 2018, the buyers withdrew, without prejudice, their causes of action insofar as asserted against the defendants Jill Allegretti, Esq., and Morici & Morici, LLP, as Escrow Agent.

the cooperative corporation to cover the demolition phase of the renovation. The agreement provided, in pertinent part, that,

> "[a]t the completion of the work, the Shareholder[s] will deliver to the Corporation an amended Certificate of Occupancy and a certificate of the Board of Fire Underwriters, if either be required, and such other proof as may be necessary to indicate that all work has been done in accordance with all applicable, laws, ordinances and government regulations. If an amended Certificate of Occupancy or certificate of Board of Fire Underwriters is not required, the Shareholders['] architect or engineer must submit a statement to that effect."

On March 9, 2009, the demolition was completed. On July 16, 2010, the sellers, in their capacity as "purchaser," acquired the rights to a portion of the space in the elevator machine room, to be used in conjunction with their unit, and executed a purchase and sale agreement with the cooperative corporation. That agreement provided, in pertinent part, that,

> "[i]n addition to entering into an Alteration Agreement and adhering to its terms, Purchaser agrees to the following as a condition of annexing and altering the Elevator Control Room Space:
>
> "(a) In lieu of obtaining an amended Certificate of Occupancy, and if permitted by law, [sellers] may obtain a Certification of Completion for the combining of the Apartment and the Elevator Control Room Space provided that a controlled inspection is performed by the City of New York Department of Buildings. If the rules and regulations of any State, City or municipal agency require that the Certificate of Occupancy for the Building be amended as a result of the alterations to the Apartment and to the Elevator Control Room Space, [shareholders] agree[ ] to obtain an amended Certificate of Occupancy for the Building and to pay the costs, filing fees or other expenses associated therewith, including any expeditor's costs provided that [shareholders] shall not be required to take any action or incur any expense to remove violations on the Building that are not attributable to the Apartment and provided further that [cooperative corporation] cooperates with [shareholders] to the extent reasonably necessary to obtain such amended Certificate of Occupancy."

On December 1, 2010, the sellers executed a second alteration agreement for the rebuild phase of the renovation. That agreement also provided that, at the completion of the work, the sellers would deliver, to the cooperative corporation, a certificate of completion, an amended Certificate of Occupancy, and a certificate from the Board of Fire Underwriters, if either of the latter two were required, to demonstrate their compliance with all applicable laws.

In or about early 2018, the sellers and buyers began negotiating the sale and purchase of the sellers' shares, proprietary lease, and ownership interests with respect to the unit. The

**158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID**
**Motion No. 002 003**

Page 3 of 17

[* 3]

sellers provided the buyers with the documents required to be submitted to the board of directors of the cooperative corporation (the board) in connection with the buyers' application for approval by board (the board package). Among these documents were blank forms, consisting of a proposed assumption of alteration agreement, an alteration agreement, and a form acknowledgement of building policies. On April 6, 2018, the buyers and sellers entered into the contract of sale for the shares allocated to the unit, to which was annexed a rider and supplemental rider to the contract. The buyers and sellers agreed to a purchase price of $18,500,000. The supplemental rider, which the parties agreed would govern and control in the event of inconsistencies between the contract, the rider, and the supplemental rider, provided, pertinent part, that,

> "[s]upplementing Paragraph 4.1.6 of the Contract, in connection with the substantial renovations made to the Unit in 2008, to the extent Seller has them in its possession, Seller agrees to furnish, *prior to or at closing*, copies of all alteration agreements between Seller and the Corporation or the Managing Agent, and all as-built drawings, mechanical and engineering plans. To the extent they are not in Seller's possession, Seller will obtain the mechanical plans from its architect to the extent they are in the architect's possession and provide same to Purchaser at Closing. To the best of Seller's knowledge, there exist no claims by the Corporation regarding alteration of the Unit. Seller further represents and warrants that no alterations or improvements which require the Corporation's consent will be made prior to closing, *except to the extent necessary to comply with the terms of this Contract*"

(emphasis added). As relevant here, paragraph 4.1.6 of the contract recited that,

> "[s]eller has not made any material alterations or additions to the Unit without any required consent of the Corporation or, to the Seller's actual knowledge, without compliance with all applicable law. This provision shall not survive Closing."

Additionally, when they executed the contract of sale, the buyers paid a deposit in the sum of $1,850,000 to the former defendant Morici & Morici, LLP, as escrow agent. On April 25, 2018, the buyers submitted their completed application for approval to the cooperative corporation, which included a fully executed board package that, in turn, included a signed assumption of alteration agreement and an acknowledgement of building policies form.

On May 25, 2018, the cooperative corporation approved the buyers' application, and informed the parties to the contract that "the sellers have a pending C[ertificate] of O[ccupancy]

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No. 002 003

Page 4 of 17

[* 4]

4 of 17

issue that . . . must be resolved prior to closing." On May 29, 2018, the sellers obtained a temporary certificate of occupancy from the New York City Department of Buildings (DOB), with an expiration date of August 27, 2018. On June 14, 2018, the cooperative corporation sent a draft of an escrow and hold harmless agreement to the contracting parties in connection with the certificate of occupancy. The proposed agreement would have required the sellers separately to deposit the sum of $50,000 (hereinafter the funds) into escrow for the benefit of "the final sign-off and obtaining an updated or amended permanent C of O." That proposed agreement also provided that, should the sellers have failed to obtain the final sign-off and permanent certificate of occupancy from the DOB within 90 days of the closing of title to the shares, the buyers would assume the responsibility to obtain the final sign-off and permanent certificate of occupancy, but the $50,000 in funds would be made available to the buyers for any applicable expenses. Additionally, that proposed agreement provided that the buyers and sellers jointly and severally agreed to indemnify and hold harmless the escrow agent and its owners, managers, and employees for any actions taken or not taken by the agent or its affiliates, including the costs and expenses of any defense in an action arising under that agreement. On June 18, 2018, counsel for the buyers objected to her clients' assumption of the responsibility for obtaining the permanent certificate of occupancy.

On July 31, 2018, the buyers' attorney sent a letter to the sellers and their attorneys, reiterating the buyers' unwillingness to assume any continuing obligation to obtain the permanent certificate of occupancy or indemnify the escrow agent, and their continued unwillingness to execute the proposed escrow and hold harmless agreement. The letter also referenced paragraph 4.1.7 of the contract of sale, regarding the sellers' "actual knowledge of any agreement (other than the Lease) affecting title to the Unit or its use and/or occupancy after Closing, or which would be binding on or adversely affect Purchaser after Closing (e.g. a sublease or alteration agreement)." The letter asserted that, while the contract was executed on April 6, 2018, the buyers did not become aware of the certificate of occupancy issue until May

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID                    Page 5 of 17
Motion No.  002 003

5 of 17

[* 5]

29, 2018. In light of the foregoing, the buyers' attorney advised the sellers that the buyers were terminating the contract of sale due to the sellers' purported breach of paragraph 4.1.7, and the buyers demanded the return of their deposit.

On August 9, 2018, the sellers' attorney responded in writing, and rejected the allegations of breach, based on the contents of the supplemental rider and the terms thereof, which counsel noted governed the total agreement between the parties where there were any inconsistencies with the main contract of sale. Additionally, the sellers' attorney advised the buyers and their attorney that the cooperative corporation was no longer requiring them to execute the escrow and hold harmless agreement, and that the closing of the contract was being scheduled for September 11, 2018, with "time being of the essence." On August 17, 2018, the buyers' attorney formally rejected the closing date, and asserted that the buyers already had terminated the contract of sale, and continued to await the return of their deposit. Finally, On August 28, 2018, the sellers' attorneys again rejected the buyers' purported termination of the contract, and reminded them that the closing of the contract was still scheduled for September 11, 2018. The buyers did not appear on September 11, 2018. On September 30, 2019, the sellers obtained the permanent certificate of occupancy on behalf of the cooperative corporation in connection with expansion of the living space allocated to the unit. On June 23, 2021, the sellers sold the unit to another purchaser for $13,220,000, a sum that was $5,280,000 less than the sales price set forth in the contract of sale.

III.     DISCUSSION

The buyers commenced this action on September 10, 2018. In their first amended complaint, filed on May 6, 2022, they asserted a breach of contract claim, pursuant to paragraph 4.1.7 of the contract of sale and paragraph 4 of the supplemental rider, contending that the sellers had represented therein that they had no knowledge of any agreements or claims that would adversely affect the buyers after the closing of title of the shares allocated to the unit. The buyers alleged that the sellers were, in fact, aware of the alteration and elevator control

room agreements, the adverse effects that these agreements would have on the buyers, a pending claim by the cooperative corporation as to those agreements, and the legal obligation that the sellers obtain a permanent certificate of occupancy. The buyers also asserted a cause of action to recover for fraudulent inducement, based on the sellers' alleged failure to disclose these agreements, and their purported misrepresentations regarding the permanent certificate of occupancy. Finally, the buyers alleged that they were damaged in the amount $1,850,000 plus interest, and demanded attorneys' fees and the costs of prosecuting this action.

In support of their summary judgment motion, the sellers submitted the pleadings, the alteration and elevator control room agreements, the contract of sale, the rider, the supplemental rider, both the blank and executed and signed board package documents referable to the proposed sale, and the board's approval of the buyers' application. Additionally, the sellers submitted the proposed escrow and hold harmless agreement, the various written communications between the parties regarding the escrow agreement, the temporary and permanent certificates of occupancy, the transcript of the September 11, 2018 closing, and the deposition transcripts of Allen Brill, general counsel of the cooperative corporation, and Jay M. Newman, the sellers' real estate counsel.

### A. Summary Judgment Standards

It is well settled that the movant on a summary judgment motion "must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to eliminate any material issues of fact from the case" (*Winegrad v New York Univ. Med. Ctr.*, 64 NY2d 851, 853 [1985] [citations omitted]). The motion must be supported by evidence in admissible form (*see Zuckerman v City of New York*, 49 NY2d 557, 562 [1980]), as well as the pleadings and other proof such as affidavits, depositions, and written admissions (*see* CPLR 3212). The facts must be viewed in the light most favorable to the non-moving party (*see Vega v Restani Constr. Corp.*, 18 NY3d 499, 503 [2012]). In other words, "[i]n determining whether summary judgment is appropriate, the motion court should draw all reasonable inferences in

favor of the nonmoving party and should not pass on issues of credibility" (*Garcia v J.C. Duggan, Inc.*, 180 AD2d 579, 580 [1st Dept 1992]). Once the movant meets his or her burden, it is incumbent upon the non-moving party to establish the existence of material issues of fact (*see Vega v Restani Constr. Corp.*, 18 NY3d at 503). A movant's failure to make a prima facie showing requires denial of the motion, regardless of the sufficiency of the opposing papers (*see id.; Medina v Fischer Mills Condo Assn.*, 181 AD3d 448, 449 [1st Dept 2020]).

"The drastic remedy of summary judgment, which deprives a party of his [or her] day in court, should not be granted where there is any doubt as to the existence of triable issues or the issue is even 'arguable'" (*De Paris v Women's Natl. Republican Club, Inc.*, 148 AD3d 401, 403-404 [1st Dept 2017]; *see Bronx-Lebanon Hosp. Ctr. v Mount Eden Ctr.*, 161 AD2d 480, 480 [1st Dept 1990]). Thus, a moving defendant does not meet his or her burden of affirmatively establishing entitlement to judgment as a matter of law merely by pointing to gaps in the plaintiff's case. He or she must affirmatively demonstrate the merit of his or her defense (*see Koulermos v A.O. Smith Water Prods.*, 137 AD3d 575, 576 [1st Dept 2016]; *Katz v United Synagogue of Conservative Judaism*, 135 AD3d 458, 462 [1st Dept 2016]).

### B. Breach of Contract

To establish a cause of action alleging breach of contract, a plaintiff ultimately must demonstrate the "formation of a contract between the parties, performance by the plaintiff, the defendant's failure to perform, and resulting damage" (*Flomenbaum v New York Univ.*, 71 AD3d 80, 91 [1st Dept 2009]). Crucially, the construction of an unambiguous contract is an issue of law, to be decided by the court, as is the issue of whether the terms of the contract are ambiguous in the first instance (*see NFL Enters. LLC v Comcast Cable Communications, LLC*, 51 AD3d 52, 58[1st Dept 2008]). The question of whether an ambiguity exists must be ascertained from the face of an agreement, without regard to extrinsic evidence (*see Warberg Opportunistic Trading Fund, L.P. v GeoResources, Inc.*, 112 AD3d 78, 84 [1st Dept 2013]; *Schmidt v Magnetic Head Corp.*, 97 AD2d 151, 156 [2d Dept 1983]). The court concludes that

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No. 002 003

Page 8 of 17

the terms of the contract of sale, the rider, and the supplemental rider are not ambiguous. The sellers have established, prima facie, that they did not breach the contract of sale by demonstrating that the buyers were aware, at all relevant times, of the alteration and elevator control room agreements, and the obligation to obtain a permanent certificate of occupancy. While the sellers did, in paragraph 4.1.7 of the contract of sale, represent that they had not entered into, and had no knowledge of, any agreement, such as an alteration agreement, that affected title to the shares allocated to the unit, or which would be binding upon or adversely affect the buyers after closing, the supplemental rider, which all parties agreed would govern if there were any inconsistencies between the supplement rider and other contract documents, essentially annulled that provision, along with other paragraphs of the contract relating to the alterations (*see Monaghan v Cole*, 171 AD3d 558, 558-559 [1st Dept 2019]). Specifically, the supplemental rider provided that it was supplementing paragraph 4.1.6 of the contract of sale, "in connection with the *substantial renovations made to the Unit in 2008*" (emphasis added), to the extent that the sellers would furnish copies of all alteration agreements they had in their possession prior to *or* at closing (emphasis added). Shortly after the execution of the contract, rider, and supplemental rider, and long before the scheduled closing date, the buyers executed the documents constituting the board package, which included, inter alia, the assumption of alteration agreements and the acknowledgment of building policies. The assumption of alteration agreement provided, as relevant here, that the buyers

> "ASSUME[ ] AND AGREE[ ] TO PERFORM AND COMPLY with all the terms, covenants and conditions of all prior alterations of and Alteration Agreement for subject unit between Assignor and the Lessor Corporation, including, without limitation, the obligation to maintain and repair, at Assignee's expense, the alteration work which was the subject of the Alteration Agreement"

(emphasis in original). With regard to the acknowledgment of building policies form and agreement, the buyers acknowledged and agreed that,

> "[t]he Undersigned have received and read the Alterations Agreement for the above referenced building and understand the procedures and requirements for any alterations to above referenced unit."

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No. 002 003

Page 9 of 17

[* 9]

While not required to be submitted in the final, executed board package, the buyers received copies of the cooperative corporation's standard alteration agreement, which included the same language and requirements for the certificate of occupancy that the sellers and the cooperative corporation had included in their alteration and elevator control room agreements.

In opposition to the sellers' showing, the buyers failed to raise a triable issue of fact. The court finds unavailing the buyers' arguments that they only learned about the alteration agreements after entering into the contract of sale, and, thus, that the sellers failed fully to perform their own obligations under the contract. Additionally, there is no merit to the buyers' contention that there was an outstanding claim by the cooperative corporation regarding the alteration agreement, specifically the need to obtain the certificate of occupancy. Importantly, the obligation to obtain the certificates of occupancy, both temporary and permanent, did not have an effect on either the cooperative corporation's approval of the buyers' application, or the title, use, and/or occupancy of the unit after the closing.

While the cooperative corporation initially did require that all issues surrounding the certificate of occupancy be resolved prior to the closing, and requested the parties to execute a hold harmless and escrow agreement, the cooperative corporation later withdrew such requirements when the buyers themselves expressed their unwillingness to execute or comply with such an escrow agreement. The court notes that, in any event, the cooperative corporation's initial requirement that the buyers execute this type of escrow agreement did not adversely affect them. That proposed agreement was unequivocal in that the sellers not only would be the parties required to fund the escrow account, but that they would be required to pursue the issuance of the permanent certificate of occupancy for a period of 90 days after closing. Only if the permanent certificate of occupancy were not obtained within that period of time would the buyers have been required to assume that obligation, and the buyers nonetheless would have the escrow funds deposited by the sellers at their disposal to pay for any expenses that they incurred in obtaining the permanent certificate of occupancy. The court

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No.  002 003

Page 10 of 17

notes that, in any event, the indemnification provision of the proposed escrow agreement would have bound the buyers to a similar indemnification clause that was contained in the board package alteration agreement that they represented that they had received, read, and agreed to; specially, that provision recited that "the Shareholder," which, after closing, would have referred to the buyers, "agrees to indemnify and hold harmless the Corporation, and . . . agents . . . from and against any and all claims . . . as a result of . . . the Shareholder's failure to comply with the Shareholder's obligations hereunder." Said obligations would have no doubt included obtaining the permanent certificate of occupancy in question.

Although a "time is of the essence" clause for a scheduled closing set forth in contract is enforceable (*see Plotch v 375 Riverside Dr. Owners, Inc.,* 92 AD3d 478, 478 [1st Dept 2012]), the contract, rider, and supplemental rider here did not contain such a clause. Nonetheless, while "[t]ime is not of the essence of a contract which is to be performed within a reasonable time, . . . either party can make it so whenever he desires by simply giving notice to that effect" (*Taylor v Goelet*, 208 NY 253, 259 [1913]; *John F. Trainor Co. v G. Amsinck & Co.,* 199 App Div 693, 697 [1st Dept 1922]; *Enfeld Holdings, LLC v Carroll,* 2021 NY Slip Op 30697[U]*, 8, 15, 2021 NY Misc LEXIS 968, *8, 16 [Sup Ct, N.Y. County, Feb. 23, 2021]).

> "'The notice setting a new date for the closing must (1) give clear, distinct, and unequivocal notice that time is of the essence, (2) give the other party a reasonable time in which to act, and (3) inform the other party that if he [or she] does not perform by the designated date, he [or she] will be considered in default' (*Lashley v BDL Real Estate Dev. Corp.,* 212 AD3d 800, 801 [2d Dept 2023] [internal quotation marks omitted]; *see Herman v 818 Woodward, LLC*, 218 AD3d 756, 758-759 [2d Dept 2023]). 'It does not matter that the date is unilaterally set, and what constitutes a reasonable time for performance depends upon the facts and circumstances of the particular case' (*Lashley v BDL Real Estate Dev. Corp.,* 212 AD3d at 801 [alterations, citations, and internal quotation marks omitted]; *see Kugel v Reynolds,* 228 AD3d 743, 747 [2d Dept 2024]; *Ashkenazi v Miller,* 190 AD3d [668,] 671 [(2d Dept 2021)])"

(*Fink v 218 Hamilton, LLC,* 233 AD3d 649, 651 [2d Dept 2024]). After the buyers purportedly terminated the contract, the sellers here rejected the purported termination, and sent the buyers a notice rescheduling the closing date, in which they gave the buyers at least 30 days' notice of that new date. The notice explicitly informed the buyers that time was of the essence in

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No. 002 003

Page 11 of 17

11 of 17

connection with the new date. Hence, the buyers' refusal to proceed to closing on the rescheduled date demanded by the sellers constituted the buyers' default under the contract.

> "'An anticipatory breach of contract by a promisor is a repudiation of [a] contractual duty before the time fixed in the contract for . . . performance has arrived' (10-54 Corbin on Contracts § 54.1 [2017]; see 13 Williston on Contracts § 39:37 [4th ed]). An anticipatory breach of a contract—also known as an anticipatory repudiation—'can be either a statement by the obligor to the obligee indicating that the obligor will commit a breach that would of itself give the obligee a claim for damages for total breach or a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach' (*Norcon Power Partners v Niagara Mohawk Power Corp.*, 92 NY2d 458, 463 [1998] [internal quotation marks omitted]; see 2B NY PJI2d 4:1 at 35-36 [2017])"

(*Princes Point LLC v Muss Dev., LLC*, 30 NY3d 127, 133 [2017]). "For an anticipatory repudiation to be deemed to have occurred, the expression of intent not to perform by the repudiator must be 'positive and unequivocal'" (*id.*, quoting *Tenavision, Inc. v Neuman*, 45 NY2d 145, 150 [1978]; see *Ga Nun v Palmer*, 202 NY 483, 489 [1911]).

Inasmuch as the court concludes that the sellers did not breach the contract of sale, as supplemented by the rider and the supplemental rider, the buyers' termination of the contract of sale was wrongful and unwarranted, and constituted an anticipatory repudiation of the contract of sale that entitles the sellers immediately to claim damages for a total breach (*see American List Corp. v. U.S. News & World Report, Inc.*, 75 NY2d 38, 44 [1989]). Moreover, the buyers' refusal to participate in the rescheduled closing, after receiving notice that time was of the essence with respect to the new closing date, constituted an independent default in connection with their obligations under the contract, entitling the sellers, at the very least, to retain the downpayment held in escrow (*see Diplomat Props., L.P. v Komar Five Assoc., LLC*, 72 AD3d 596, 600 [1st Dept 2010]; *Rivera v Konkol*, 48 AD3d 347, 348 [1st Dept 2008]).

With respect to the issue of damages, Paragraph 13.1 of the contract provides that, in the event of a default by the buyers,

> "[s]eller[s'] sole and exclusive remedies shall be to cancel this Contract, [and] retain the Contract Deposit as liquidated damages. . . . Purchaser prefers to limit exposure for actual damages to the amount of the contract deposit, which purchaser agrees constitutes a fair and reasonable amount of compensation for

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID                    Page 12 of 17
Motion No.  002 003

12 of 17

Seller's damages under the circumstances and is not a penalty. The principles of real property law shall apply to this liquidated damages provision."

In the absence of such a limiting provision, the sellers otherwise would have been entitled to recover the benefit of their bargain upon the buyers' breach (*see Weiss v Karch,* 62 NY2d 849, 850 [1984] [contract for sale of cooperative apartment was, "in reality a sale of securities in the cooperative corporation," and thus is governed by UCC 2-713(1), and "'benefit of the bargain' damages thereunder are to be determined by using the measure of 'the difference between the market price at the time when the [seller] learned of the breach and the contract price'"]; *BSL Dev. Corp. v Broad Cove, Inc.,* 178 AD2d 394, 395 [2d Dept 1991]; *Lotito v Mazzeo,* 132 AD2d 650, 651 [2d Dept 1987]). Since, however, the contract contained such a limiting provision, the court concludes that the sellers are entitled to payment of the deposit, in the sum of $1,850,000.

Hence, that branch of the sellers' motion seeking summary judgment on their breach of contract counterclaim must be granted (SEQ 002), and that branch of the buyers' motion which was for summary judgment on their breach of contract cause of action must be denied (SEQ 003). Inasmuch as the buyers' breaches of their obligations under the contract entitle the sellers to retain the buyers' downpayment, the court directs the escrow agent to tender, to the sellers, the downpayment that it holds in escrow, in the sum of $1,850,000, plus any interest that may have accrued thereon if the escrow had been held in an interest-bearing account.

### C. Fraudulent Inducement

To successfully plead and prove common-law fraudulent inducement, a plaintiff must assert the misrepresentation of a material fact, known by the defendant to be false and intended to be relied on when made, and show that there was justifiable reliance and resulting injury (*see Braddock v Braddock,* 60 AD3d 84, 86 [1st Dept 2009]). For the same reasons stated above, the court finds that the sellers established, prima facie, that they did not misrepresent any material fact to the sellers, since the sellers were aware of the alteration agreements and obligation to obtain a certificate of occupancy at all relevant times. The buyers failed to raise a

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No.  002 003

Page 13 of 17

13 of 17

triable issue of fact in opposition to the sellers' showing in this regard. Thus, summary judgment must be awarded to the sellers dismissing the buyers' fraudulent inducement cause of action.

### D. Declaratory Judgment and Attorneys' Fees

CPLR 3001 provides, in relevant part, that,

> "[t]he supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed. If the court declines to render such a judgment it shall state its grounds."

"In an action for a declaratory judgment, the demand for relief in the complaint shall specify the rights and other legal relations on which a declaration is requested and state whether further or consequential relief is or could be claimed and the nature and extent of any such relief which is claimed" (CPLR 3017[b]). The sellers have satisfied the pleading requirements in this matter. The court concludes that the sellers established, prima facie, that the buyers' basis for termination of the contract of sale was improper and that their failure to appear at the scheduled closing constituted a default under the contract. In opposition to that showing, the buyers failed to raise a triable issue of fact. Hence, the sellers are entitled to summary judgment on their counterclaim for declaratory relief, and a judgment declaring that the buyers' basis for termination of the contract of sale was improper and that their failure to appear at the scheduled closing constituted a default under the contract.

Moreover, an award of statutory prejudgment interest is mandatory in breach of contract and quasi-contract actions (see *Rosenblum v Rosenblum*, 214 AD3d 440, 442 [1st Dept 2023]; CPLR 5001[a]). Such an award is calculated from the date of breach (see *id.*). Since the buyers anticipatorily repudiated the contract on July 31, 2018, and the court finds that their repudiation was unwarranted and constituted a breach of contract, it finds that to be the date of breach. As such, statutory prejudgment interest at the statutory rate of 9% per annum must be awarded to the sellers and against the buyers, in the sum of $1,850,000, from July 31, 2018.

Finally, the court also awards the sellers their attorneys' fees pursuant to paragraph 15 of the Rider, which recites that,

158359/2018   SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No. 002 003

Page 14 of 17

[* 14]

"[i]f either party brings any action or legal proceeding for damages or specific performance arising out of an alleged breach of this Contract, then the prevailing party in any such action or proceeding shall also be entitled to recover as part of such action or proceeding or in any separate action brought for that purpose, such party's reasonable attorney's fees and costs."

The court notes, however, that the sellers have yet to submit an affirmation of attorneys' services, bills, or invoices to support their request for such an award. Hence, they are directed to submit such an affirmation and supporting documentation on or before May 16, 2025, after which the court will issue a supplemental order addressing the issue and directing the entry either of amended or separate money judgments.

IV.    CONCLUSION

The court has considered the parties' remaining contentions and find them to be unavailing.

In light of the foregoing, it is

ORDERED that the motion of the defendants David Tolley and Nancy Lee for summary judgment,

> (a) dismissing the first amended complaint insofar as asserted against them,
>
> (b) on their counterclaims to recover for breach of contract and declaring (i) that the plaintiffs, Charles Scharf and Amy Scharf, had no basis upon which to terminate a contract of sale, dated April 6, 2018, which was referable to the purchase and sale of shares of stock in 115 Central Park West Corporation and had been allocated to apartment unit 31-33CD in an apartment building located at 115 Central Park West, New York, NY 10023, and (ii) that the plaintiffs' failure to appear for a time-of-the-essence closing on September 11, 2018 constituted a default of their obligations under that contract of sale, and
>
> (c) directing Morici & Morici, LLP, as escrow agent, to release, to them, the sum of $1,850,000, representing the plaintiffs' downpayment, that it currently holds in escrow (MOTION SEQUENCE 002)

is **granted,** the first amended complaint is dismissed insofar as asserted against the defendants David Tolley and Nancy Lee, those defendants are awarded summary judgment declaring that the plaintiffs, Charles Scharf and Amy Scharf, had no basis upon which to terminate the contract of sale, dated April 6, 2018, which was referable to the purchase and sale of shares of stock in 115 Central Park West Corporation and had been allocated to apartment unit 31-33CD in an

[* 15]

apartment building located at 115 Central Park West, New York, NY 10023, and that the plaintiffs' failure to appear for a time-of-the-essence closing on September 11, 2018 constituted a default of their obligations under that contract of sale; and it is further,

ORDERED that Morici & Morici, LLP, as escrow agent, shall, within 45 days of the entry of this decision, order, and judgment, release the downpayment deposit funds that it holds in escrow, in the amount of $1,850,000, to the defendants David Tolley and Nancy Lee; and it is further,

ORDERED that the motion of the plaintiffs, Charles Scharf and Amy Scharf, for summary judgment on their first cause of action in the first amended complaint, which sought to recover damages for breach of contract, dismissing the counterclaims of the defendants David Tolley and Nancy Lee, and awarding them reasonable attorneys' fees and costs (MOTION SEQUENCE 003), is *denied*; and it is, further,

ORDERED that, on the court's own motion, the plaintiffs' causes of action to recover money damages and the counterclaim of the defendants David Tolley and Nancy Lee to recover damages for breach of contract are severed from those defendants' counterclaims seeking a declaratory judgment; and it is further,

ADJUGED AND DECLARED that the plaintiffs, Charles Scharf and Amy Scharf, had no basis upon which to terminate the contract of sale, dated April 6, 2018, which was referable to the purchase and sale of shares of stock in 115 Central Park West Corporation and had been allocated to apartment unit 31-33CD in an apartment building located at 115 Central Park West, New York, NY 10023; and it is further,

ADJUDGED AND DECLARED that the plaintiffs' failure to appear for a time-of-the essence closing on September 11, 2018 constituted a default of their obligations under that contract of sale; and it is further,

ORDERED that the Clerk of the court shall enter a money judgment (a) awarding a sum equal to 9% per annum of the principal amount of $1,850,000, from July 31, 2018, in favor of the

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No.  002 003

Page 16 of 17

16 of 17

[* 16]

defendants David Tolley and Nancy Lee, and against the plaintiffs, Charles Scharf and Amy

Scharf, and (b) dismissing the first amended complaint insofar as asserted against the

defendants David Tolley and Nancy Lee; and it is further,

ORDERED that, on or before May 16, 2025, the defendants David Tolley and Nancy Lee

shall submit an affirmation of attorneys' services, bills, and invoices to support their application

for an award of attorneys' fees.

This constitutes the Decision, Order, and Judgment of the court.

_____4/7/2025_____
DATE

JOHN J. KELLEY, J.S.C.

| MOTION 002: | [X] CASE DISPOSED | | | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | [X] GRANTED | [ ] DENIED | | GRANTED IN PART | [ ] OTHER |
| APPLICATION: | [ ] SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | [ ] INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | [ ] REFERENCE |
| MOTION 003: | [X] CASE DISPOSED | | | NON-FINAL DISPOSITION | |
| | [ ] GRANTED | [X] DENIED | | GRANTED IN PART | [ ] OTHER |
| APPLICATION: | [ ] SETTLE ORDER | | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | [ ] INCLUDES TRANSFER/REASSIGN | | | FIDUCIARY APPOINTMENT | [ ] REFERENCE |

158359/2018  SCHARF, CHARLES vs. TOLLEY, DAVID
Motion No.  002 003

Page 17 of 17

17 of 17